## Case No. 6,550.

### In re HOBBS et al.

[1 Woods, 537; [1] 4 Am. Law T. Rep. U. S. Cts. 190.]

Circuit Court, N. D. Georgia. Aug., 1871.

MISCEGENATION—CIVIL RIGHTS BILL—FOURTEENTH AMENDMENT.

The marriage relation between white persons and persons of African descent is prohibited, and declared null and void by the law of Georgia: *Held*, that marriage laws are under the control of the states, and that the law named is not annulled or affected by the civil rights bill of congress or the fourteenth amendment to the constitution of the United States.

[Cited in Bertonneau v. Directors of City Schools, Case No. 1,361; State v. Tutty, 41 Fed. 757.]

[Cited in Baylies v. Curry, 128 Ill. 288, 21 N. E. 595.]

The relators were tried before the thirty-fifth senatorial district court of this state in the city of Atlanta, for the offense of fornication. It appears by the record, that the ordinary of Fulton county, Georgia, on August 31, 1870, issued a license directed to any minister of the gospel, judge of superior court or justice of the peace, to join in the state of matrimony the relators, "provided there is no lawful cause to obstruct the same, according to the constitution and laws of this state." The following is a copy of the certificate, which is also before me: "I certify that William B. Hobbs and Martha A. Johnson were joined together in the holy bands of matrimony on the 1st day of September, 1870, by me. Owen George." The parties were severally put upon trial before the state court and pleaded not guilty; and after argument of counsel and charge of the court the jury returned a verdict of guilty against each. Whereupon the court sentenced William B. Hobbs to pay one thousand dollars and costs, or in default to be put to work on the city or town streets or public roads of the county for six months from date of the sentence. A similar sentence was passed upon Martha A. Hobbs (alias Johnson), that she pay a fine of two hundred dollars or be put to work, etc., for the term of three months. At the time the writ of habeas corpus was applied for, the relators were in the custody of the jailer of Fulton

county. The petition, among other things, stated that the relators were restrained of their liberty in violation of the constitution and laws of the United States. The writ was granted and served by the United States marshal on the jailer, who brought the parties before the United States district judge, and made the proper return upon the writ, and the question of the discharge of relators was heard on the 22d day of August, 1871.

Thrasher & Thrasher and Oglesby, for relator.

W. G. Irwin, contra.

ERSKINE, District Judge. Counsel for the relators rely upon the fourteenth amendment to the constitution, and the act of congress passed April 9, 1866, commonly known as the civil rights bill. 14 Stat. 27. The first section of the fourteenth amendment declares that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The fifth section provides that congress shall have power to enforce the amendment by appropriate legislation.

The civil rights bill was, as may be seen, passed a short time before the fourteenth amendment received the sanction of the people of the United States. In May, 1870, congress passed an act to carry into effect the fourteenth and fifteenth amendments, and by section 18 re-enacted the civil rights bill. 16 Stat. 140. The first section of this famous bill of rights is as follows: "That all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall have the same right in every state and territory in the United States, to make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to the full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary, notwithstanding."

The primary, but not the only question presented by the relators for consideration is, whether section 1707 of the Code (Irwin's) of Georgia is repugnant to the fourteenth

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

amendment and the civil rights bill, or to either of them—whether it invades or abridges any of the privileges or immunities—fundamental rights—secured to every citizen, by the constitution or the act of congress? The section referred to is in these words: "The marriage relation between white persons and persons of African descent is forever prohibited, and such marriages shall be null and void." This enactment was on the statute book when the state constitution of 1868 was framed. It was said, however, that it was the purpose of the convention to abrogate it by inserting section 11 of article 1. This is the section: "The social status of the citizen shall never be the subject of legislation." But the supreme court of the state, in June, 1869, in Scott v. State, 39 Ga. 321, unanimously held that section 1707 of the Code was not in conflict with this provision in the state constitution. McCay, J. (concurring in the judgment of Brown, C. J., and Warner, J.), said: "These and such laws have no bearing on the social status of the citizen. They still leave persons to choose their associates, though they provide that they shall not enter into a particular civil contract." This being the law of Georgia—this being the interpretation by the supreme court of the state of a clause in the state constitution—which clause or provision has not been challenged here as being obnoxious to the constitution of the United States—it becomes my duty to ascertain and decide whether section 1707 is an infraction of the fourteenth amendment or the laws of congress made for its enforcement.

[It may not be unworthy of observation that, since the decision of the state supreme court, in Scott v. State, there have been two sessions of the general assembly—composed of colored members as well as white—yet no effort whatever was made at either session to repeal or modify section 1707. And in October, 1870, a law was enacted to "Establish a System of Education" [Laws Ga. p. 57]. By section 32, it was provided that the white and colored youth should be taught in separate schools. On the final passage of the bill all the colored and nearly every white member voted in the affirmative.] [2] Though marriage is not unfrequently viewed in our own country, as well as by foreign jurists, as a contract in the common meaning of the term—and, indeed, it cannot be logically denied that it has, in a limited sense, properties which assimilate it to an ordinary contract, being a consentient covenant—yet it is something more; it is an institution of public concernment, created and governed by the public will of the state or nation. It is a relation which can be annulled only through the intervention of judicial tribunals, unless such power has been also given to the legislature. [Mr. Bishop, in his accurate and learned work on Marriage and Divorce, says (volume 1, § 3): "While the contract is

merely an executory agreement to marry, it differs not essentially from other executory contracts; it does not superinduce the status. * * * But when the contract is executed in what the law regards a valid marriage, its nature as a contract is merged in the higher nature of the status."] [2] Nor, I apprehend, is marriage considered to be embraced within that clause of section 10 of article 1 of the national constitution, which prohibits the states from passing any law impairing the obligation of contracts; and Chief Justice Marshall, in Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 518, observes "That the provision in the constitution has never been understood to embrace other contracts than those which respect property or some object of value, and confer rights which may be asserted in a court of justice. It has never been understood to restrict the general rights of the legislature to legislate on the subject of divorces." In another part of the opinion, the same great magistrate said: "The framers of the constitution did not intend to restrain the states in the regulation of civil institutions, adopted for internal government." Id. 629. And Mr. Justice Daniel, in Butler v. Pennsylvania, 10 How. [51 U. S] 402, said that "the contracts designed to be protected by the constitution are those by which perfect rights, certain definite, fixed private rights of property are vested." So, on principle and authority, it is plain that the institution of marriage is not technically a contract, nor can it be said to relate to property. The brief remarks on the subject of the marriage relation or status, and that it is not within the protection of section 10, art. 1, of the original constitution, have been made for the purpose of showing that, as words, as a general rule, are to be taken in their natural and ordinary sense, it is to be presumed that the word "contracts," as employed in the civil rights bill, possesses an equivalent, and not a narrower or broader meaning than the same word as used in the provision of the constitution just referred to. By looking to the act itself, this view will become conspicuously manifest. It provides that the colored citizen shall have the right to make and enforce contracts, sue, be parties, give evidence, inherit, purchase and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by the white citizens—equal privileges and immunities with the white citizen.

In the case of Live Stock, etc., Association v. Crescent City, etc., Co. [Case No. 8,408], which was decided in New Orleans, a few days after the passage of the law reenacting the civil rights bill, but before the reenactment obtained publicity, Mr. Circuit Justice Bradley (Woods, Circuit Judge, concurring) remarked that the civil rights bill was in pari

materia with the fourteenth amendment, and was probably intended to reach the same object. And he further said, that the court was disposed to hold "that the first section of the bill covered the same ground as the fourteenth amendment—at least so far as the matters in this case are concerned." And, so far as the questions in the case before me are involved, the language of Mr. Justice Bradley comes with direct pertinency. A careful perusal of the amendment and the bill makes it obvious that the design and object of both was, not only to guaranty, in the largest sense, to every citizen in the United States, the sacred right of equality before the law throughout the whole land; but also, to protect from invasion and abridgement all the privileges and immunities—essential rights—that belong to the citizen and which flow from the constitution. And I will here remark, that there still lie dormant in the national legislature, under the original constitution and the amendments thereto, vast and various powers which but await such exigencies as are necessary to call them into action. Any attempt on my part to enumerate or describe the fundamental rights of the citizen comprehended in the words "privileges and immunities," secured by the fourteenth amendment to all the citizens of the United States, would give but an unsatisfactory result. The same words are found in clause 1, § 2, art. 4, of the original constitution. But that clause applies only to citizens removing from one state to another. And the supreme court of the United States, in Conner v. Elliott, 18 How. [59 U. S.] 593, declined to describe or define the word "privileges," saying, "It is safer and more in accordance with the duty of a judicial tribunal to leave its meaning to be determined in each case, upon a view of the particular rights asserted and denied therein."

In Gibbons v. Ogden, 9 Wheat. [22 U. S.] 188, Chief Justice Marshall said: "The framers of the constitution and the people who adopted it must be understood to have employed words in their natural sense, and to have understood what they meant." And Judge Cooley, in his work on Constitutional Limitations (page 59), uses the following clear and attractive language: "Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government." And now it may be asked, does section 1707 of the Code, conflict with the fourteenth amendment, by abridging any of the privileges or immunities secured therein to the citizens—to the relators, white and colored, or deny to them the equal protection of the laws? Or does it conflict with the civil rights bill? The state law prohibits marriage between a white person and a person of African descent, and declares such marriage null and void. If this prohibition is transgressed, neither pains nor penalties follow to either party. But if the parties cohabit, the law of the state deems them guilty of fornication, and punishes them by fine, imprisonment and labor on the public highway, or any one or more of these penalties in the discretion of the court. Code, §§ 1707, 4245, 4487. In Barber v. Barber, 21 How. [62 U. S.] 582, Mr. Justice Wayne, speaking for the court, disclaimed any jurisdiction in the courts of the United States upon the subject of divorces. And Mr. Bishop says: "All our marriage and divorce laws * * * are state laws and state statutes; the national courts with us, not having cognizance of the matter within our localities." 1 Bish. Mar. & Div. § 87. [Congress, however, has enacted laws regulating marriage and divorce in the District of Columbia; and has likewise prohibited polygamy in any "territory or other place over which the United States has exclusive jurisdiction." Act 1860, c. 158 (12 Stat. 59); Act 1862, c. 126 (12 Stat. 501).] [3]

I have given the matters involved in this suit careful consideration, and I am of opinion that neither congress, in framing the fourteenth amendment, nor the people, when they ratified it, contemplated that questions of this nature were comprehended within the terms "privileges and immunities" as employed in that instrument. The marriage relation, which is a civil institution, has hitherto been regulated and controlled by each state within its own territorial limits, and I cannot think it was intended to be restrained by the amendment, so long as the state marriage regulations do not deny to the citizen the equal protection of the laws. Nor do I think that the state law operates unequally; the marriage relation between whites and colored cannot exist under the statutes of this state— it is null and void as to both. And the punishment or penalty adjudged to the colored citizen found guilty of fornication is like that —and none other—which is inflicted on the white citizen, the co-offender. In my judgment, neither section 1707, which inhibits marriage between a white person and a person of African descent, nor sections 4245 and 4487 which provide for the punishment of colored and white persons who are found guilty of the crime of fornication, fall within the influence of the provisions contained in the fourteenth amendment or the civil rights bill.

It is therefore ordered that the relators be remanded to the custody of the jailer.

---

[3] [From 4 Am. Law T. Rep. U. S. Cts. 190.]