## Case No. 9,585.

### MILLER v. NEW YORK et al.

[13 Blatchf. 469.] 2

Circuit Court, S. D. New York. Aug. 4, 1876.

BRIDGES — OBSTRUCTION TO NAVIGATION— VIOLA-
TION OF LAW—REGULATION OF COMMERCE.

1. A citizen of New York brought suit in this court against the municipal corporations of the cities of New York and Brooklyn, and certain individual citizens of New York, to restrain the building of a bridge in New York across the East river, a navigable river, on the ground that it would be a public nuisance: Held, that this court had no jurisdiction of the suit, so far as any question of a violation of the law of New York was concerned, but that it could take jurisdiction to enquire whether the bridge was being so built as to violate the constitution or laws of the United States.

2. The history of the legislation of New York and of the United States, in regard to such bridge, reviewed.

1 [Reported by Hon. William Cranch, Chief Judge.]

2 [Reported by Hon Samuel Blatchford, District Judge, and here reprinted by permission.]

3. Under such legislation of the United States, if the bridge is constructed in conformity with the requirements of law, it follows that the navigation of the river will not thereby, in contemplation of. law, be obstructed, or impaired or injuriously modified.

4. Congress had power to authorize, as a regulation of commerce, the building of the bridge in the prescribed manner.

[Cited in People v. Kelly, 76 N. Y. 482.]

5. It appearing that the bridge was being constructed according to the requirements of the legislation of congress, and that the state of New York had, by subsequent legislation, sanctioned its being constructed in such manner, an injunction to restrain its erection, as a public nuisance, was refused.

[6. Cited in Walsh v. Trustees of New York & Brooklyn Bridge, 96 N. Y. 438, to the point that the "Trustees of the New York and Brooklyn Bridge" are not a corporation, and, as such, necessary parties to the suit.]

[This was a bill by Abraham B. Miller against the mayor, aldermen, and commonalty of the city of New York, city of Brooklyn, and others, for a preliminary injunction to restrain the erection of a bridge over the East river, between New York and Brooklyn.]

William H. Arnoux, for plaintiff.

Charles H. Tweed and Edgar M. Cullen, for defendants.

JOHNSON, Circuit Judge. The plaintiff in this suit is a citizen of the state of New York, and the defendants are the municipal corporations of the cities of New York and Brooklyn, and also certain individual citizens of the state. This court, therefore, derives no jurisdiction from the citizenship of the parties, for it is, in general, only when there is a controversy between citizens of different states that jurisdiction is conferred upon the ground of the citizenship of the parties. We must look, therefore, to the subject-matter of the suit, to sustain the jurisdiction. The circuit courts of the United States have original cognizance, concurrent with the courts of the several states, of all suits of a civil nature, at common law or in equity, arising under the constitution or laws of the United States, or treaties made, or which shall be made, under their authority. Act March 3, 1875, § 1 (18 Stat. 470).

The claim of the plaintiff is, that the proposed bridge over the East river, between the cities of New York and Brooklyn, will be a public nuisance, from which he will suffer a particular private injury, other than the common injury which every citizen suffers from a public nuisance. Now, if the bridge will be a public nuisance, it must be because it will violate the law of New York or that of the United States. For a violation of the law of New York the plaintiff cannot come into this court. He and the defendants are citizens of New York, and he must seek his remedy from the justice of that state. Jurisdiction in that behalf between citizens of the same state is not conferred upon the circuit courts of the United States. In Milnor v.

New Jersey R. Co. [Case No. 9,620], Mr. Justice Grier, giving judgment in the circuit court for the district of New Jersey, said: "The complainants in these bills, in order to show jurisdiction in the court, have stated themselves to be citizens of the state of New York. Their right to a remedy in the courts of the United States is not asserted on account of the subject-matter of the controversy, but they rest upon their personal right, as citizens of another state, to sue in this tribunal. It is plain, by their own showing, that they can demand no other remedy from this court than would be administered by the tribunals of the state of New Jersey, in a suit between her own citizens. A citizen of New York who purchases wharves in Newark has no greater right than the citizen of New Jersey." In the case now before this court, a citizen of New York sues corporations and citizens of New York. That alone does not make a case of jurisdiction in this court, nor would the jurisdictional difficulty be avoided by the existence of a cause of action for a violation of the law of New York. On neither ground, nor on both combined, can this court entertain jurisdiction. Just as diversity of citizenship, in the case before Judge Grier, required him to administer the law of New Jersey between the parties in that suit, so, identity of citizenship in this case excludes a violation of the law of New York from being the subject of redress in this court between these parties. Here, the subject-matter of the suit alone gives jurisdiction, and it must, in its exercise, be confined to that subject-matter.

The inquiry is, therefore, whether, by the constitution or laws of the United States, the bridge in question will be a public nuisance and specially injurious to the plaintiff. If, upon inquiry, it shall be found that the bridge in question is being built in conformity with, and not in violation of, the constitution and laws of the United States, then no court of the United States can regard it as a public nuisance, nor undertake by injunction to interfere with its construction.

The congress has legislated directly upon the subject of this bridge, and in that law has referred to the previous legislation of New York. It will, therefore, be most convenient to state, in their chronological order, the laws of the state and of the United States relating to the building of the bridge.

Chapter 399, p. 948, of the Laws of New York, passed April 16th, 1867, created a corporation by the name of The New York Bridge Company, for the purpose of constructing and maintaining a permanent bridge over the East river, between the cities of New York and Brooklyn. To this corporation power was given to acquire and hold so much real estate as might be necessary for the site of the bridge, and of all piers, abutments, walls, toll houses, and other structures proper to said bridge, and for the opening of suitable avenues of approach of said bridge, but not

any land under water, in the river, beyond the pier lines established by law. By the 10th section, it was further enacted, that the bridge should not be at a less elevation than one hundred and thirty feet above high tide at the middle of the river; that it should not obstruct any street which it should cross, but that such street should be spanned by a suitable arch or suspended platform as should give a suitable height for the passage under the same for all purposes of public travel or transportation; that no street running in the line of the bridge should be closed without full compensation to the owners of land fronting on the same, for all damages they might sustain; that the bridge should commence at or near the junction of Main and Fulton streets, in Brooklyn, and should be so constructed as to cross the river as directly as possible to some point at or below Chatham Square, in the city of New York, not south of the junction of Nassau and Chatham streets; and that it should be built with a substantial railing or siding, and should be kept fully lighted through all hours of the night. This section was prefaced with a provision in these words: "Nothing in this act contained shall be construed to authorize, nor shall it authorize, the construction of any bridge which shall obstruct the free and common navigation of the East river, or the construction of any pier in the said river, beyond the pier lines established by law." It will be observed, that this is not a prohibition of the obstruction of navigation. Appropriate language of prohibition is found immediately below—"it shall not obstruct any street which it shall cross." This provision is limited to enacting that the statute shall not be taken to authorize the obstruction of navigation.

This act was followed, in 1869, by chapter 26 of the Laws of that year (page 15), passed February 20th, by which, after providing for the representation of the two cities of New York and Brooklyn, in the board of directors of the bridge company, it was enacted that the company should proceed without delay to construct the bridge.

In the same year, an act of congress was passed, approved March 3, 1869 (15 Stat. 336), which enacted (section 1) that "the bridge across the East river, between the cities of New York and Brooklyn, in the state of New York, to be constructed under and by virtue of an act of the legislature of the state of New York, entitled, 'An act to incorporate the New York Bridge Company, for the purpose of constructing and maintaining a bridge over the East river, between the cities of New York and Brooklyn,' passed April 16th, 1867, is hereby declared to be, when completed in accordance with the aforesaid law of the state of New York, a lawful structure and post road for the conveyance of the mails of the United States: provided, that the said bridge shall be so constructed and built as not to obstruct, impair or injuriously modify, the navigation of the river; and, in order to

secure a compliance with these conditions, the company, previous to commencing the construction of the bridge, shall submit to the secretary of war a plan of the bridge, with a detailed map of the river at the proposed site of the bridge, and for the distance of a mile above and below the site, exhibiting the depths and currents at all points of the same, together with all other information touching said bridge and river, as may be deemed requisite by the secretary of war to determine whether the said bridge, when built, will conform to the prescribed conditions of the act, not to obstruct, impair or injuriously modify, the navigation of the river." By the second section, it was further enacted, "that the secretary of war is hereby authorized and directed, upon receiving said plan and map, and other information, and upon being satisfied that a bridge built on such plan, and at said locality, will conform to the prescribed conditions of this act, not to obstruct, impair or injuriously modify, the navigation of said river, to notify the said company that he approves the same, and, upon receiving such notification, the said company may proceed to the erection of said bridge, conforming strictly to the approved plan and location. But, until the secretary of war approve the plan and location of said bridge, and notify said company of the same in writing, the bridge shall not be built or commenced, and, should any change be made in the plan of the bridge, during the progress of the work thereon, such change shall be subject likewise to the approval of the secretary of war." It will be observed, that this act of congress takes up the subject of the effect of the bridge upon the navigation of the river, where it was left by the law of New York, and introduces positive provisions on the subject, in place of the merely negative provision of the New York statute. That statute goes no further than to say that it shall not be construed to authorize an obstruction, while the act of congress contains a provision, that the bridge shall be so constructed and built as not to obstruct, impair or injuriously modify, the navigation. It goes further and fixes the mode by which it shall be ascertained whether these conditions are observed in the plan of the bridge. The determination of this question is committed to the secretary of war, who is directed, upon being satisfied that the bridge, as proposed, will not obstruct, impair or injuriously modify the navigation, to notify the company that he approves the bridge. When this has been done, the act declares that the company may proceed to the erection of the bridge, conforming strictly to the approved plan and location.

If the foregoing is a correct interpretation of the act of congress, and if the steps pointed out in the act have been taken, then there is the direct authority of congress for proceeding in the construction of the bridge, in conformity with the approved plans, and a conclusive determination that the navigation of the river will not thereby be obstructed, impaired or injuriously modified, unless congress does not possess the power thus to legislate. But, in the case of State of Pennsylvania v. Wheeling Bridge Co., 18 How. [59 U. S.] 421, the authority of congress, under the constitution, to authorize, as a regulation of commerce, that which the judgment of the supreme court had determined to be an obstruction of the navigation of the Ohio river, was maintained. The court held, that the previous judgment had been given on the ground that the regulations of commerce, by authority of congress, existing at the time, were contravened by the bridge, and that it, consequently, was unlawful. The new statute removed this unlawfulness, by adopting a new regulation of commerce. The first clause of the head note to the case states accurately the doctrine maintained by the decision: "The power of congress to regulate commerce includes the regulation of intercourse and navigation, and, consequently, the power to determine what shall or shall not be deemed, in judgment of law, an obstruction of navigation." In that case, the state of Pennsylvania brought its suit in the supreme court of the United States, which had jurisdiction by reason of the character of the party, irrespective of the subject-matter of the action. The state was entitled to maintain its action by showing an obstruction unlawful either by the law of Virginia, or by the law of the United States; and, therefore, it was requisite, in giving judgment against its claims, to deny the unlawfulness of the obstruction, in both of its aspects. The bridge appeared to have the sanction of congress and of the state legislature, and so its lawfulness could not be impeached. But, all the cases in the supreme court, authoritatively decided, hold that the laws of congress, in regulation of commerce, are paramount. Thus, in the case of Willson v. Blackbird Creek Marsh Co., 2 Pet. [27 U. S.] 250, which came up by writ of error from the court of appeals of Delaware, of which state the plaintiffs in error (who were defendants below), were citizens, Chief Justice Marshall said: "This abridgment," (of the navigability of a river by a dam erected under a law of Delaware), "unless it comes in conflict with the constitution or a law of the United States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance." He further observed, that, if congress had passed any act which bore upon the case, the court would not feel much difficulty in saying that a state law coming in conflict with such act would be void. The case was, however, disposed of on the ground that congress had not exercised its power to regulate commerce in such a way as was repugnant to the law of Delaware in question, and that it, therefore, was not invalid.

The first determination in State of Pennsylvania v. Wheeling Bridge Co., 13 How.

[54 U. S.] 518, was only the other side of the same doctrine. There the court held that congress had regulated commerce upon the Ohio river in such a way as came in conflict with the legislation of Virginia, and that the action of congress was paramount.

Gilman v. Philadelphia, 3 Wall. [70 U. S.] 713, was a suit where the jurisdiction rested upon the diversity of citizenship, and where a bridge about to be built by authority of a law of Pennsylvania was assailed as creating an unlawful obstruction to navigation, especially injurious to the rights of the plaintiffs as wharf and dock owners. All the court agreed in the view, that the power of congress was paramount, when· exercised. The majority, however, held that it had not been so exercised as to require the court to declare unlawful what was about to be done in pursuance of a law of Pennsylvania, and the decision was against the plaintiffs.

In this circuit have occurred the cases of Silliman v. Hudson River Bridge Co. [Cases Nos. 12,851, 12,852], and 1 Black [66 U. S.] 582, and 2 Wall. [69 U. S.] 403, and of Silliman v. Troy Bridge Co. [Case No. 12,853], in each of which the lawfulness of a bridge built in pursuance of a law of the state of New York was finally sustained. In the Hudson River Bridge Co. Case, an injunction was granted originally, but, upon final hearing, the judges of the circuit court differed in opinion, and the judges of the supreme court, likewise, were equally divided upon the question of the jurisdiction of the circuit court perpetually to restrain the erection of the bridge over the Hudson river, authorized by a law of the state of New York. The case was, therefore, remitted to the circuit court, and the bill was, consequently, dismissed. Upon appeal from this final decree, the supreme court was again equally divided, and the judgment, therefore, stood affirmed. In the last case, that of the Troy bridge, the question whether that bridge would cause a material obstruction to the navigation of the Hudson, if built in conformity to the law of the state of New York, was examined at the suit of a citizen of another state, who, as a navigator under a coasting license, was interested in the question, and it was held that such an obstruction would not be created by the building of the bridge in the manner authorized by the law of New York.

It results from the cases considered, that the authority of congress is paramount, in the regulation of commerce, under the constitution; and that its determination in respect to interference with navigation, by obstructions thereto, is conclusive. What it authorizes may be justified upon its authority. What it forbids is necessarily unlawful. Nor is it to be forgotten, that this power of congress is at all times capable of exercise. If it should turn out that the judgment of congress has been mistaken, and that navigation is injuriously affected, it can, by law, require the bridge to be altered or removed, and can adapt its regulation of commerce to its view of the public interests.

It remains to consider whether the authority of the act of congress has been pursued. It appears, from the papers presented on this motion, that the required papers were presented by the bridge company to the secretary of war, and that after a careful investigation, through the corps of engineers and a special commission appointed for the purpose from that body, the secretary of war made his decision in writing, under date of June 19th, 1869, signed with his hand, and endorsed upon the report to him of the chief of engineers. By that decision he approved the plan as so reported, with the single modification, that the height of the centre of the main span of the bridge should not be less than 135 feet in the clear, at mean high water of the spring tides, and provided that the structure should conform in all other respects to the conditions recommended by the commission. By the same document he directed the chief of engineers to furnish the bridge company with a copy of the report of the commission, and a copy of the report on which his endorsement was made, and to notify the company that the plan and location of the bridge were approved, subject to the conditions imposed in that endorsement. On the 21st of June, 1869, the chief of engineers wrote to the president of the bridge company, in pursuance of the orders of the secretary of war, as follows: "Sir—I am directed by the secretary of war to inform the New York Bridge Company that he approves the plan and location of the East river bridge, as reported by the company to the commission instituted by orders from the war department, provided the bridge conform to the following conditions:" These conditions are then specified, in accordance with the decision of the secretary, but are not necessary to be here stated.

The substance of the requirement of congress was, that the secretary of war should approve the plan, and that, upon such approval and notice thereof, the company should have authority to proceed. It was not, in my opinion, necessary that the notice to the company should be under the hand of the secretary himself. It suffices that he, in writing under his hand, made the determination, and directed the notice to be given, and that it was given accordingly. It is not claimed that any departure has occurred, in the actual construction of the bridge, from the plans and conditions imposed by the secretary of war, nor that any such departure is intended; and, therefore, if I am right in the positions before maintained, the plaintiff is not entitled to the writ of injunction which he asks from this court.

But, if it should be considered necessary that any further assent or approval should be given by the state of New York to the construction of this bridge in the manner proposed and sanctioned by the secretary of war,

I am of opinion that such assent has been given by the act of the legislature of New York, passed May 14, 1875 (Laws N. Y. 1875, p. 290). This act was passed years after the transactions heretofore commented on, and after the form and conditions for the construction of the bridge were settled so far as the company and the United States could settle them, and the work had progressed far towards its termination. The act in question is entitled, "An act providing that the bridge in the course of construction over the East river, between the cities of New York and Brooklyn, by the New York Bridge Company, shall be a public work of the cities of New York and Brooklyn, and for the dissolution of said company, and the completion and management of the said bridge by the said cities." By force of and under its provisions it became the law of New York, that the bridge in course of construction over the East river should be completed and managed as thereinafter provided, for and on behalf of the cities of New York and Brooklyn, as a consolidated district. The said bridge was thereby declared to be a public highway, for the purpose of rendering the travel between the said cities certain and safe at all times. It was further declared, that, from and after the dissolution of the company, the said bridge "shall be a public work, to be constructed by the two cities for the accommodation, convenience and safe travel of the inhabitants of the said district;" and that "the said bridge, and all its appurtenances, and all the property and effects connected therewith, shall vest absolutely in the cities of New York and Brooklyn." By this legislation, the bridge, in its entirety, as then contemplated, became a public work, and received the sanction of the state of New York. No indictment against the two cities for erecting or maintaining it, founded upon the idea of its being a nuisance, could have been supported in the courts of New York, and, of course, the plaintiff could not there have effectually asserted what the state itself could not have maintained.

I have not thought it worth while to advert to the very indirect interest of the plaintiff in the question involved. He is not a navigator, nor interested in navigation directly. He is a warehouse keeper, and the more vessels that can come near his warehouses the better are his chances of getting business. Whether an obstruction below him will be an injury or a benefit when the Hell Gate channel is cleared out, is, at least, problematical. Nor has it seemed necessary to notice the delay of six years, during which several millions have been expended on the bridge, while the plaintiff could have proceeded at once to present the question for judicial consideration.

The motion for an injunction must be denied.

[NOTE. In June, 1880, the case came up for final hearing. The bill was dismissed, with costs. 10 Fed. 513. The cause was then taken by the plaintiff, on appeal, to the supreme court, where the decree of the circuit court, dismissing the bill, was affirmed. 109 U. S. 385, 3 Sup. Ct. 228.]