UNITED STATES *v.* BUNTIN.*

*(Circuit Court, S. D. Ohio, W. D.* February, 1882.)

1. CRIMES—DEPRIVATION OF CIVIL RIGHTS—COLORED SCHOOL CHILDREN—REQUISITES TO CONVICTION—REV. ST. § 5510.

In a prosecution under section 5510, Rev. St., for depriving a colored child of the right to attend public school, *held* that, to warrant conviction, the defendant must have excluded such child under color of a law, statute, ordinance, regulation, or custom of a state, and on account of his color.

2. SAME—CIVIL ACTION NOT A BAR TO CRIMINAL PROSECUTION.

*Held,* also, that the institution of a civil action and recovery of damages for the deprivation of the right charged in the indictment, is not a bar to a criminal prosecution therefor.

3. SAME—ADMISSION OF OFFENCE—GOOD CHARACTER IMMATERIAL.

Where the defendant admits the essential elements of the crime alleged, except that the prosecuting witness possessed the right which the defendant is charged with violating,—*i. e.*, in this case, where he admits the exclusion of the child; that he excluded him under color of a statute of the state, and because of his color,—evidence of defendant's good character is immaterial, and entitled to no consideration by the jury.

4. SAME—ACTING IN GOOD FAITH UNDER ADVICE OF COUNSEL NO DEFENCE—MITIGATION.

That the defendant in good faith consulted counsel, and was advised by them that he was authorized to do that with which he is charged, and acted on such advice, is no defence to the indictment, although such evidence would address itself strongly to the discretion of the court after conviction in mitigation of punishment.

5. CIVIL RIGHTS—SEPARATE SCHOOLS FOR COLORED CHILDREN.

Separate schools may be provided for colored children, but they must be reasonably accessible, and must afford substantially equal educational advantages with those provided for white children.

6. SAME—OHIO STATUTE NOT IN CONFLICT WITH FOURTEENTH AMENDMENT.

The provisions of the Ohio statute upon the subject (section 4008, Ohio Rev. St.) are not in conflict with the fourteenth amendment.

*State* v. *McCann,* 21 Ohio St. 198, followed.

Indictment for Deprivation of Civil Rights. It charged that one John Buntin deprived James H. Vines and others, children of Jacob H. Vines, of a right secured by the constitution and laws of the United States, to-wit, the right to attend the only public school situated in a certain subdistrict in Washington township, Clermont county, Ohio; said children being entitled to attend said school, and said Buntin then being the teacher of said school, and excluding said children therefrom by reason of their being colored children of African descent, under color of a statute of Ohio providing that the

*Reported by J. C. Harper, Esq., of the Cincinnati bar.

school boards of two or more adjoining districts may unite in establishing a separate school for colored children, and under color of a regulation excluding colored children.

The testimony showed that there was no school for colored children in the subdistrict in which the prosecuting witness resided. The school for white children was situated about three miles from his house. The township board of education had established **a** separate school for the colored children of the township, under the provisions of section 4008 of the Revised Statutes of Ohio, which is as follows:

" When, in the judgment of the board, it will be for the advantage of the district to do so, it may organize separate schools for colored children. The boards of two or more adjoining districts may unite in a separate school for colored children, each board to bear its proportionate share of the expense of such school according to the number of colored children from each district in the school, which shall be under the control of the board of education of the district in which the school is situated."

This school was located about five miles from the prosecuting witness' home.

The other facts appear in the opinion.

*Channing Richards*, U. S. Dist. Atty., for prosecution.

*John Johnston* and *H. J. Buntin, contra.*

BAXTER, C. J., (*charging jury.*)  Much has been said and quite an array of books produced to prove that a *criminal intent* is a necessary ingredient of every crime. The proposition, when properly understood, is correct. But what is a criminal intent? This depends somewhat upon the nature of the crime with which the accused is charged. The decision by Judge Rives, which has been read to the court in your hearing, was made in a case in which a jury commissioner was indicted for excluding colored persons from serving as jurors. The essence of the crime, in that case, consisted in the exclusion of colored men from serving as jurors on account of their color. They might have been excluded for the want of sufficient intelligence, or other good and valid reason; and, if so, the defendant would not have been guilty. Hence the motive actuating the accused became a material inquiry. His motive was the principal element of the crime, and it was incumbent on the government to prove the unlawful intent, which in that case constituted the offence, before a conviction could be lawfully demanded. The same may be said in relation to many other crimes. The crime of passing counterfeit money consists in the passing of it with a knowledge of its spurious character. If passed without such knowledge there would

be no legal guilt. The same may be said of the crime of forgery, as knowledge and an intent to defraud are essential elements of the crime. A great many other cases, illustrative of the principle, might be cited if it were deemed necessary. Let us see how far it is applicable to the case now under consideration.

Through amendments to the constitution of the United States, which now constitute part of that instrument and are parts of the supreme law of the land, those of our fellow-citizens who were held in slavery were emancipated, and clothed with all the rights of citizenship. They have, under the constitution, all the rights that you and I possess. Yea, more: having just emerged from a servile condition, and being incapable of defending themselves against the aggressions of the more intelligent and stronger race, statutes intended to secure to them the full benefit of the recent constitutional amendments have been passed for their special protection. Among others, congress has enacted (Rev. St. § 5510) that "every person who, under color of any law, statute, ordinance, regulation, or custom, subjects, or causes to be subjected, any inhabitant of any state or territory to the deprivation of any rights, privileges, or immunities secured or protected by the constitution and laws of the United States * * * on account of such inhabitant being an alien, or by reason of his color or race, * * * shall be punished," etc.

It is important to note the intent and scope of this statute. The mere fact of defendant having excluded the colored boy mentioned in the indictment from the privileges of the school taught by him, would not be a violation of the act. More than this must be proven before you will be authorized to convict. He must have been excluded under some color of law, statute, ordinance, regulation, or custom of the state, and on account of his color. If, therefore, this defendant did exclude the colored boy named in the indictment from the privileges of the school taught by him, after being requested by the trustees of the subdistrict to permit him to enter it, claiming the right to do so under authority of the statute providing for the separate education of colored children in schools to be established and maintained for that purpose, and did so on account of his color, the court instructs you that you ought to find him guilty as charged, unless you shall find in his favor upon the question of fact to which I will hereafter direct your attention.

We will, however, before presenting the question of fact upon which the result in this case depends, notice the several defences urged by defendant's counsel:

1. It incidentally appeared in the progress of the examination of the witnesses that a civil suit had been prosecuted against the defendant to recover damages for the deprivation of the rights of the prosecuting witness alleged in the indictment in this case; and it is insisted by counsel that that civil suit in which damages were recovered "exhausted the remedy," and bars this prosecution. This defence, gentlemen, cannot be maintained. The prosecution and recovery in the civil suit does not, in the least, preclude the government from the prosecution of this indictment. The civil suit was for the wrong inflicted on the individual; this indictment is for the wrong done, or supposed to have been done, to the public; and the result of the former case can in no way affect the result to be reached in this one.

2. The defendant has been permitted to introduce witnesses to prove that he is a man of good character. The law presumed as much before the evidence was adduced. This evidence was followed by an elaborate argument, supported by numerous authorities, to impress the court with its importance and value. The *authorities* are all right. But have they any application to the facts of this case? The defendant has testified in his own behalf, and upon his examination admitted that a separate school had been provided for the education of the colored children of his district, to which he thought the prosecuting witness ought to have gone; that notwithstanding the request of the trustees to defendant to receive and instruct the prosecuting witness in the school which he was teaching, he thought he had no right to be taught there; and that, acting under color of the law which provided a separate school for colored children, and because the prosecuting witness was a colored boy, he, the defendant, declined to permit him to enter the school taught by him, but excluded him therefrom. Such is the testimony of the defendant himself. There is, then, nothing left in the case on which the evidence of defendant's good character can have any legitimate bearing. If a defendant, being indicted for a breach of a criminal law, admits all the elements that enter into and constitute the crime, of what avail is good character? If defendant were to deny the facts alleged in the indictment; if he were to insist that the evidence on the part of the prosecution was untrue; if he were to make and present an issue of fact as between himself and other witnesses, or even stand upon his plea of "not guilty,"—then, and in either of such events, the jury, in passing upon the question of defendant's guilt or innocence, would be authorized to consider the evidence of his good character, and give to it just as much weight as they in their judgment believed, in view

of all the other evidence in the case, it was entitled to; and in case the evidence of his guilt or innocence was evenly balanced, evidence of defendant's good character would be sufficient to justify an acquittal. But as the defendant, as a witness, admitted the exclusion of the prosecuting witness from the privileges of the school, and that he excluded him under color and by authority of a statute of the state, and because of his color, the evidence of defendant's good character becomes immaterial, and is entitled to no consideration at your hands.

3. It has been further contended that as defendant was advised by counsel and acted in the belief that he was authorized by law to exclude the witness from the school, he is guiltless of any crime, and entitled, on this ground, to an acquittal. But this position, gentlemen, cannot be conceded. If the advice of counsel could be pleaded and relied on as a good defence to an indictment for a violation of the criminal laws, the execution of these laws would depend more on the construction which the accused and their legal advisers might place upon them, than upon their interpretation by the courts. In fact, if such was the proper ruling, the recent amendments to the national constitution would, through the advice of counsel, and the honest or simulated convictions of offenders, be rendered nugatory or eliminated from that instrument. The principle contended for is, to a limited extent, applicable to civil actions. For instance, if A. procured B. to be prosecuted for an alleged crime, and B. should be acquitted thereof, and sue A. for having had him prosecuted without probable cause, the law, in its tenderness, would permit A. to prove that he acted in good faith upon the advice, honestly obtained, of a reputable attorney, as a defence to B.'s suit. But the principle has not been carried into the criminal law. Such evidence would address itself strongly to the discretion of the court after conviction in mitigation of punishment, but constitutes no sufficient and valid defence to an indictment for crime. The legal profession includes many able, honest, and useful members. But there are others who are deficient in capacity, learning, or honesty, who are incapable of giving sound and wholesome counsel. There are others who it may be are capable of performing a better part, but whose custom is to ascertain what their clients most desire, and advise them accordingly. One-half of the litigation with which the courts are burdened, results, I think, directly or remotely from the misadvice of attorneys. It may be that defendant acted in good faith upon the instructions received from his attorney, and honestly believed that he was acting in accord-

ance with the law; but, notwithstanding, ignorance of the law is not a valid defence, and if you shall find that he excluded the prosecuting witness from the school, under color of the state statute, and on account of his color,—these being the three elements constituting the crime with which he stands charged,—it will be your duty to find him guilty, unless you shall find for defendant, as has been previously stated, on the question of fact to which your attention will now be directed.

The negro, under the national constitution and laws, is invested with precisely the same rights that are possessed by the white race, and subject to the same duties, obligations, and liabilities. The school which defendant was teaching was a *public* school, established and maintained with public money, to which every child, whether white or black, of that school district, had the right to go for instruction, unless some other school of substantially equal merit had been provided for them. It is, however, insisted that such provision had been made for the prosecuting witness. That there was such a school in that district for the education of colored children is conceded. The supreme court of the state has held that such a classification of the two races is within the constitutional discretion of the legislature, and that the separate education of the whites and blacks in accordance with the terms of the law is no wrong to either.* I concur in and adopt this decision as a correct exposition of the constitution, and instruct you that if there was such a school in the district for the education of colored children, affording substantially the same educational advantages as were afforded by the school from which the prosecuting witness was excluded, and reasonably accessible, it was his duty to have gone there, and the defendant did him no wrong in the exclusion complained of. But if, as has been contended, you shall find that said colored school was so remote from the prosecuting witness' residence that he could not attend it without going an unreasonable and oppressive distance; that he was thus placed at a material disadvantage with his white neighbors; that the school did not offer substantially the same facilities and educational advantages that were offered in the school established for the white children, and from which he had been excluded,—then and in that event he was entitled to admission in said last-named school, and his exclusion therefrom was a denial and a deprivation of his constitutional right. How the facts are it is your province to decide. Upon your finding

*State **v.** McCann, 21 Ohio St. 198.—[REP

upon this question the guilt or innocence of defendant depends.    If, then, you shall find that another school of equal merit had been provided, reasonably accessible to the witness, offering the same, or substantially the same, educational facilities and advantages, said witness ought to have availed himself of it, and was subject to no wrong in being excluded from the other; and in that event your verdict ought to be for defendant.    But, if the contrary is true, the defendant would be guilty, and you ought so to find.    Take and consider the case, and report your verdict to the court.

The jury disagreed.

### NOTE.

1. PUBLIC SCHOOLS.  The question in the principal case as to the constitutionality of laws providing separate schools for colored children does not arise, as has been sometimes supposed, under the clause of the fourteenth amendment prohibiting the states from making and enforcing " any law which shall abridge the privileges or immunities *of citizens of the United States.*"  This provision refers only to those privileges and immunities which are derived *as citizens of the United States,* as distinguished from those derived *as citizens of the state.*  In the *Slaughter-house Cases,* 16 Wall. 36, this distinction is pointed out, and the general character of the rights embraced within each class explained.  The right to attend the public schools of a state clearly does not come within the first class.  Education is a subject of domestic concern.  The legislature of a state may determine to have no system of public instruction at all; but when it has created such a system, the clause of the fourteenth amendment, prohibiting any state from denying " *to any person within its jurisdiction the equal protection of the laws,*" controls the power of the state over the enjoyment of the rights conferred by such system. The weight of authority accords with the view of the learned judge deciding the principal case, that this provision still leaves it within the discretion of the legislatures of the several states to provide separate schools for colored children.  These cases maintain that equality of rights does not involve the necessity of educating white and colored persons in the same school, any more than it does that of educating children of both sexes, or of keeping different grades of scholars, in the same school; that " *equality of rights* does *not* necessarily imply *identity of rights.*"  But all these decisions hold that the advantages afforded by such schools must be, in all respects, substantially equal to those furnished by the schools for white pupils.  *Bertonneau* v. *Directors,* 3 Woods, 177; *State* v. *Flood,* 48 Cal. 56; *Corry* v. *Carter,* 48 Ind. 327; *State* v. *McCann,* 21 Ohio St. 198; *People* v. *Gaston,* 13 Abb. (N. Y.) Pr. (N. S.) 160; *County Court* v. *Robinson,* 27 Ark. 116.  See concurring opinion of *Clifford,* J., in *Hall* v. *Du Cuir,* 95 U. S. 504–506; and the excellent discussion of the question in Cooley, Torts, 286 *et seq.*

In *State* v. *Flood, supra,* under a statute in California providing for separate schools, similar to that of Ohio, but where such separate school had not,

in fact, been established, it was held that colored pupils must be admitted to the schools provided for whites. Under a similar state of facts, in *State* v. *Duffy*, 7 Nev. 342, it was decided that no right secured by the fourteenth amendment had been violated, but that such exclusion was contrary to the state constitution. That such a discrimination is not also covered by the last clause of the fourteenth amendment, guarantying to all persons the equal protection of the laws, may well be questioned; and it is submitted that the best-considered authorities recognize such protection. *Van Camp* v. *Board of Education*, 9 Ohio St. 406, (1859,) which arose before the adoption of the fourteenth amendment, relief was denied, although no separate school had been established; but as to this see *State* v. *McCann*, 21 Ohio St. 208. And see, also, *Roberts* v. *Boston*, 5 Cush. 198, (1849,) where it was held that under the constitution and laws of Massachusetts different schools could be provided for the two races.

Opposed to this view stands the *dictum* of a majority of the supreme court of Kansas in the case of *Board of Education* v. *Tinnon*, 13 Cent. Law J. 272, decided last September. The court contends that if the separation of scholars on the color line can be sustained, pupils of different nationalities can be divided,—those of Irish descent from those of German descent, etc. The questions *decided* in that case are that no power has been conferred upon boards of education of cities of the second class to exclude colored children from any of the schools of the city, and that without such power they have no authority to do so. The opinion of *Valentine*, J., in his able argument against a caste classification, is an excellent example of the advanced and progressive spirit of our western states. Under the constitution and laws of Iowa and Michigan it has been held that boards of education have no right to deny scholars admission to any school on the ground of color. *Clark* v. *Board of Education*, 24 Iowa, 266, (1868;) *People* v. *Detroit*, 18 Mich. 400, (1869.)

*Mandamus* is the proper remedy to enforce admission to the school. *Board* v. *Tinnon*, (Sup. Ct. Kan. 1881,) 13 Cent. Law J. 272; *Clark* v. *Board*, 24 Iowa, 266; *People* v. *Detroit*, 18 Mich. 400; *State* v. *Duffy*, 7 Nev. 342; *Ward* v. *Flood*, 48 Cal. 36; *Corry* v. *Carter*, 48 Ind. 327; High, Ex. Leg. Rem. § 332.

2. STATE ACTION. It will be observed that the inhibitions of section 1 of the fourteenth amendment are all directed solely against state action. In the language of Justice Strong its provisions have reference to "state action exclusively, and not to any action of private individuals." *Virginia* v. *Rives*, 100 U. S. 313, 318; *Ex parte Virginia*, Id. 339; *Strander* v. *West Virginia*, Id. 303; *Neal* v. *Delaware*, 103 U. S. 370; *Texas* v. *Gaines*, 2 Woods, 342; *Miller* v. *Mayor*, 13 Blatchf. 469; *Illinois* v. *C. & A. R. Co.* 6 Biss. 107; *U. S.* v. *Cruikshank*, 92 U. S. 542; *State* v. *Dubuclet*, 5 Rep. 201; *Re Wells*, 17 Alb. L. J. 111. The prohibitions of the amendment upon the state, extend to all the agencies and instrumentalities employed in the administration of its government, whether superior or subordinate, legislative, executive, or judicial. *Ex parte Virginia*, *Virginia* v. *Rives*, *Neal* v. *Delaware*, *supra*; *Ah Kow* v. *Nunan*, 5 Sawy. 552; 18 Am. Law Reg. (N. S.) 676; *Re Parrott*, 1 FED. REP. 481.

3. CIVIL RIGHTS ACT OF MARCH 1, 1875. Senator Sumner's civil rights bill (act of March 1, 1875; 18 St. at Large, 336) provides "that all persons within the jurisdiction of the United States shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, public conveyances on land and water, theaters, and other places of public amusement, subject only to the conditions and limitation established by law, and applicable alike to citizens of every race and color, regardless of any previous condition of servitude." It is apparent that this enactment attempts to secure rights that come from the states, and which are not, therefore, covered by the second clause of the fourteenth amendment, which prohibits the states from abridging the "*privileges or immunities of citizens of the United States*." The decisions of the supreme court of the United States, above referred to, would seem to have settled that both this and the succeeding clauses of the amendment are directed only against action by some of the agencies of the state, and do not reach the conduct of private individuals, leaving that for adjustment by the state. In its application to foreign and interstate commerce it is submitted that the provision is within the power granted congress to regulate commerce. *Hall* v. *De Cuir*, 95 U. S. 485, 490. A short time after the passage of the civil rights act of 1875, Judge Emmons held that the inhibitions of the fourteenth amendment were aimed only at the action of the state, and have no reference to individuals; that the right to "the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of theaters and inns" come from the state, and the protection of that right is not within the power of congress, and that, therefore, the civil rights act is to that extent unconstitutional. Charge to Grand Jury, (May, 1875, U. S. C. C., W. D. Tenn.) 2 Am. L. T. Rep. (N. S.) 198. The reasoning of this eminent judge appears to be altogether satisfactory and conclusive. The same question was presented to Judges Blatchford and Choate, and they divided and certified it to the supreme court. *U. S.* v. *Singleton*, 1 Crim. Law Mag. 386. Judge Cadwalader held that the provisions of the act forbidding and punishing discriminations in the use of inns, theaters, public conveyances, etc., on the ground of color, were a warranted exercise of the legislative power vested in congress by the fourteenth amendment, and that a clerk in charge of an inn, who refuses accommodations to a traveler on the ground of his color, is liable to indictment and punishment under the act. *U. S.* v. *Newcomer*, (U. S. D. C., E. D. Pa. Feb. 1876,) 22 Int. Rev. Rec. 115. The opinion is little more than an announcement of this conclusion, without stating the reasons therefor. These decisions still leave it uncertain how far the act can be sustained as coming within the powers granted congress by the constitution and its amendments. For a clear and thoughtful discussion of the question see Judge Cooley's work on Torts, pages 284-6. In an indictment and in a civil action for penalty, under the civil rights act of March 1, 1875, the citizenship of the person injured must be alleged and proved. *U. S.* v. *Taylor*, 3 FED. REP. 563; *Lewis* v. *Hitchcock*, 10 FED. REP. 4; 13 Rep. 299. What is an "inn" within the terms of the act, and what is a sufficient pleading in an action for penalty for the denial of the privileges thereof, see *Lewis* v *Hitchcock, supra*. Section 4 of the act of March 1, 1875, providing that no person shall be disqualified to serve

as " a grand or petit juror in any court of the United States, or of any state, on account of race, color, or previous condition of servitude," and prescribing a penalty for such exclusion, refers to action by an agency of the state, and is within the power granted by the fourteenth amendment. *Virginia* v. *Rives, Strauder* v. *West Virginia, Ex parte Virginia,* and *Neal* v. *Delaware, supra.* As to indictment of officers for violation of this section, see *Re Co. Judges of Virginia,* 3 Hughes, 576.

4. CHINESE. Although, as expressed in the *Slaughter-house Cases,* the war amendments were adopted primarily for the emancipation and protection of the African race, their power is not circumscribed to such limits. They have already, and will in the future, serve a vastly wider and more beneficent purpose. The prohibitions of the fourteenth amendment have been found effectual to protect the Chinaman against the viciously-oppressive legislation of the Pacific states. The opinions of the federal judges, and particularly of Justice Field, in the cases cited below, are admirable illustrations of the substantial progress made towards broad and enlightened views of human rights and equality. Thus the San Francisco " Queue Ordinance," providing that prisoners in the county jail shall have their hair clipped to a uniform length of one inch from the scalp, being directed especially against the Chinese, and inflicting a cruel and degrading punishment upon them, (*Ah Kow* v. *Nunan,* 5 Sawy. 552, *Field,* J.; S. C. 18 Am. Law Reg. N. S. 676, and note by Judge Cooley;) the statute of California prohibiting all aliens incapable of becoming electors of the state from fishing in the waters of the state, (*In re Ah Chong,* 2 FED. REP. 733, *Sawyer,* J.;) the statute of California requiring a bond to be given that Chinese emigrants shall not become a charge upon the public, (*Re Ah Fong,* 3 Sawy. 144, *Field,* J.;) the constitution and statute of California forbidding the employment of Chinese or Mongolians by corporations, and punishing any officer or agent thereof who hires them, (*In re Parrott,* 1 FED. REP. 481, *Hoffman,* J.,)—have all been held to be in conflict with the fourteenth amendment and void.

5. MISCEGENATION. The laws of the southern states forbidding the marriage of white and colored persons have been held not to be obnoxious to the fourteenth amendment. *Ex parte Kinney,* 3 Hughes, 9; *Ex parte Francois,* 3 Woods, 367; *Ex parte Hobbs & Johnson,* 1 Woods, 537; *Goss* v. *State,* (Sup. Ct. Tenn. Oct. 1880,) 24 Alb. L. J. 118. See 1 Bishop, Mar. & Div. § 308 *et seq.* The imposition of a severer penalty on a man and woman of different races for living together in adultery or fornication than that imposed for the same offence upon persons of the same race, does not contravene the fourteenth amendment and civil rights act. *Green* v. *State,* 58 Ala. 190; overruling *Burns* v. *State,* 48 Ala. 195.

6. TRAVELING ACCOMODATIONS. The provisions of the civil rights act of March 1, 1875, (18 St. at Large, 336,) have been referred to heretofore in section 3 of this note. Independent of such statute, (to use the language of Judge Cooley,) " it is not very clear that inn-keepers and carriers of persons by land or by water would be warranted in law in discriminating on the ground solely of a difference in race, color, or because of any previous condition." They are public servants, and are only permitted to make discriminations which are

reasonable and founded in good public policy. It will be seen by the authorities hereafter referred to that wherever carriers or inn-keepers have been permitted to provide separate accommodations, that it has been required that such accommodations should afford equal advantages and facilities in every respect with those furnished whites; and even this discrimination, limited as I have mentioned, is not clearly justifiable. Cooley, Torts, 283 *et seq.;* *Westchester, etc., R. Co.* v. *Miller,* 55 Pa. St. 200.

The case of *Railroad Co.* v. *Brown,* 17 Wall. 446, arose under an act granting certain privileges to a railroad company, which provided that "no person shall be excluded from the cars on account of color;" and the supreme court of the United States held "that this meant that persons of color should travel in the same cars that white ones did, and along with them in such cars; and that the enactment was not satisfied by the company providing cars assigned exclusively to persons of color, though they were as good as those assigned exclusively for white persons, and, in fact, the very cars which were, at certain times, assigned exclusively to white persons." In *Chicago, etc., Ry. Co.* v. *Williams,* 55 Ill. 185; S. C. 8 Am. Rep. 641, (1870,) it was held that, if a car had been set apart for the exclusive use of ladies, and gentlemen accompanied by ladies, a colored woman could not be excluded upon the ground of her color; but the court suggested that the carrier's duty would probably be performed if it furnished a separate car or seats equally as comfortable for colored women. See *Day* v. *Owen,* 5 Mich. 520, (1858;) Thompson, Car. Pass. 335; Hutchinson, Carriers. Where a colored lady passenger on a steam-boat was not permitted to dine in the cabin, but was offered accommodations on the guards or in the pantry, a recovery against the carrier was sustained. The court held that under the laws and constitution, and its amendments, of the state of Iowa and of the federal government, a person of color is entitled to the same rights and privileges when traveling as a white person, and cannot be required by any rule or custom, based on distinctions of race or color, to accept other or different accommodations than those furnished to white persons. *Coger* v. *N. W. Union Pack. Co.* 37 Iowa, 145. See this case referred to by Justice Clifford in *Hall* v. *De Cuir,* 95 U. S. 507, 508. A railroad company may rightfully exclude from the ladies' car a female passenger whose reputation is so notoriously bad as to furnish reasonable grounds to believe that her conduct will be offensive, or whose demeanor at the time is annoying to other passengers; but mere unchastity will not warrant her exclusion from such car whether she be white or colored. *Brown* v. *Memphis, etc., R. Co.* 5 Fed. Rep. 499; 11 Rep. 424; 12 Cent. Law J. 442. Inn-keepers and carriers may provide separate accommodations for colored guests and passengers, but they must be equal in quality and convenience with those furnished white persons. *The Civil Rights Bill,* 1 Hughes, 541, 547; *Green* v. *City of Bridgetown,* (Dist. Ga.) 9 Cent. Law J. 206. See *Cully* v. *B. & O. R. Co.* 1 Hughes, 536. Also under the Pennsylvania statute prohibiting classification on account of color. *Central R. Co.* v. *Green,* 86 Pa. St. 427. Laws have been adopted in some states securing to all persons equal rights in the vehicles of common carriers, at theaters, inns, etc., and giving a right of action for the denial thereof; and such legislation has been fully sustained. *Joseph*

v. *Bidwell*, 28 La. Ann. 382; *Donnell* v. *State*, 48 Miss. 661. As to the discriminations on account of sex under the constitution of California see *Ex parte Maguire*, 12 Rep. 9.

Congress may, by legislation, provide against discriminations on account of color in interstate commerce, but legislation by the states upon that subject is a regulation of interstate commerce, and therefore unconstitutional and void. *Hall* v. *De Cuir*, 95 U. S. 485.

*Cincinnati, March,* 1882.                                    J. C. HARPER.