Lillie BOMAN et al., Appellants,

v.

BIRMINGHAM TRANSIT COMPANY,
Appellee.

No. 18187.

United States Court of Appeals
Fifth Circuit.

April 14, 1961.

Rehearing Denied April 25, 1961.

Arthur D. Shores, Birmingham, Ala.,
Thurgood Marshall, Jack Greenberg,
James M. Nabrit, III, New York City, of
counsel, for appellants.

James C. Barton, J. M. Breckenridge,
Birmingham, Ala., Deramus, Fitts &
Johnston, Birmingham, Ala., of counsel,
for appellee.

Before TUTTLE, CAMERON and
WISDOM, Circuit Judges.

CAMERON, Circuit Judge (dissenting).

I noted my dissent from the opinion
rendered in this case July 12, 1960 and
published in 280 F.2d 531. Following
are the grounds upon which my dissent
is based.

### I.

A clear understanding of the issues
presented by this appeal requires that
their statement in the majority opinion
be supplemented. The thirteen Negroes
who filed this action met at a place of
business in Birmingham to formulate
plans for riding a city bus.[1] Written
instructions had been drawn up and pass-
ed out outlining the deportment the
group should adhere to in riding the bus.
The meeting was noticed by one of the
traffic officers of the City of Birmingham
who also observed the group en route

from the place of meeting to the place of
boarding the bus.

When the bus pulled in to the regular
stop at the curb the members of the
group boarded it, took their seats at the
front of the bus and were, as shown in
the majority opinion, requested by the
bus driver to seat themselves from the
rear forward in compliance with the
stenciled sign at the front of the bus:
"White Passengers Seat from Front, Col-
ored Passengers from Rear." The court
below found from undisputed proof, and
the majority recognizes, that the ap-
proach was made in a courteous manner
and was in the form of a request, and
that there were no untoward incidents
attendant upon the request of the bus
driver and the refusal of appellees to
comply with it. Pursuant to written in-
structions theretofore given him, the bus
driver left the vehicle standing, and went
to a nearby telephone and called the dis-
patcher's office reporting what had hap-
pened. An assistant superintendent an-
swered the call, going immediately to the
bus. He did not enter it, but talked with
the driver through a window at his side.
About that time the traffic officer came,
in company with a captain of police of the
City of Birmingham whom he had called.
The latter ordered the two Transit Com-
pany employees to take the bus to the
Company's garage. This order was given
by the police because a crowd of several
hundred people had gathered around the
bus.

The police arrived ahead of the bus and
when it reached the garage they, and
probably two other members of the police
force, boarded it. The driver was di-
rected to repeat to each individual Negro
the request that he move to the back of
the bus. Four or five complied with this
request, but these plaintiffs refused.

The police, on their own motion and
without any suggestion from the Transit
Company employees, arrested nine mem-
bers of the group, and this ended what-

---

1. The only one of the group who testified
stated:
"* * * But we did plan to go down
and ride the buses to see whether or

not that the city had discontinued their
power as keep the segregated ordinance
on the bus."

ever connection the Transit Company had with the episode. The court below found on undisputed evidence that all bus drivers were instructed not to call police, that nobody connected with the Transit Company had called the police, and that the Transit Company had no connection at all with what the police did (except as above set out). The court further found that, for a period of at least five years, no employee of the Transit Company had, under like circumstances, ever called the police (and the evidence showed without contradiction that requests similar to those made here had been promptly observed over the years).

The court below further found that the new buses, which had the signs stenciled on the front and rear ends, had been ordered some months before the change of ordinances by the City Commission of Birmingham; and found that no provision had been made in the new buses for color boards such as had formerly been used. This was an economy move based upon the fact that about one hundred fifty boards per month had theretofore been removed by passengers from the buses.

The episode, planned and provoked by appellants, occurred about one week after the repeal of the old ordinance and passage of the new. Some three weeks later this action was filed against appellee, Birmingham Transit Company and the three City Commissioners of Birmingham in their individual and official capacities. The City of Birmingham was not sued, although it was included in the answer of the Commissioners. It was eliminated as a party, however, by pretrial order of the court.[2] The relief asked against the remaining parties was a declaratory judgment defining the rights of the parties, adjudging Ordinance No. 1487–F of the Birmingham City Code as applied to the plaintiffs and others similarly situated, to be unconstitutional as in violation of the Fourteenth Amendment, awarding plaintiffs money damages in the sum of $100,000, and an injunction against the defendants from enforcing said ordinance "and any custom, practice, or usage which requires segregation of the races * * * *" From this outline of the complaint it is plain that plaintiffs were not primarily seeking a judgment annulling the ordinance because of its unconstitutionality, but were making incidental reference to this claim as the basis for the other relief sought.

The gravamen of the complaint is that appellee Transit Company was conspiring and acting in concert with city officials to enforce segregation under the ordinance quoted in the majority opinion.[3]

2. "Plaintiffs state they are not making a claim for damages against the City of Birmingham and that the claim for damages against the individual defendants is on the basis that they were acting under color of office at the time complained. This proceeding is in no respect against the City of Birmingham, a municipal corporation, and plaintiffs agree that the averment 'that summons be issued to the City of Birmingham' be and the same is stricken."

3. The charge is epitomized in these words in the complaint:
"The defendant, Birmingham Transit Company, acting under color of, and in compliance with said Ordinance hereinabove set out, has caused signs to be placed on its Buses directing Negroes to seat themselves from the rear of the Bus forward and whites to seat themselves from the front of the Bus backward; and

has operated said Buses on the basis of racial segregation in violation of their rights guaranteed to plaintiffs and other Negro citizens under the Constitution and laws of the United States.

"The defendant, Birmingham Transit Company, acting in concert with the other defendants in this cause, have conspired and continue to conspire to deny these plaintiffs, and other Negroes similarly situated, rights guaranteed to these plaintiffs by the Constitution and laws of the United States.

"The defendant, Birmingham Transit Company, has stopped its Buses and called police officers of the City of Birmingham, and for the purpose of arresting plaintiffs has allowed, caused, and/or participated in the arrest of these plaintiffs, all in violation of their constitutional rights."

**6**

No proof at all was made tending to sustain these averments. The proof was all the other way; and the court below found that there had been no concert of action or conspiracy between the Transit Company and the other defendants or the policemen.[4]

The appellants argue before us that the over-all facts here warrant or compel the finding that there was collaboration. The majority, however, apparently rejects that argument. It bases its opinion entirely on the fact that the Transit Company held a franchise from the City of Birmingham to use the streets and that this fact made the acts of the Transit Company, in asking the appellees to change their seats, State action.

It is pertinent to observe the averments of the complaint with respect to the franchise feature. The only mention of a franchise is contained in these words: "The defendant, Birmingham Transit Company, Incorporated, is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business in the City of Birmingham, and is engaged in operating within the corporate limits and police jurisdiction of said city, a bus line for transportation of passengers for hire, pursuant to a franchise issued by said City of Birmingham." Appellee admit-

ted these averments in its answer. No evidence was introduced concerning the franchise, and there is no showing whether it was exclusive, mandatory or merely permissive, whether it was terminable at will, or as to any of the terms of the franchise.[5]

The point is that there is no evidence that the Transit Company had anything to do with the passage of this ordinance, or that it was advised of its existence, and certainly none that it had any notice that the policemen intended to invoke the ordinance or make any arrests, or that appellee collaborated in any way in such actions. The court below, based upon the only evidence in the record, found that appellee was not acting under the ordinance, but was proceeding pursuant to the written instructions it had given its bus operators in which it was stated that the ordinances having to do with separation of passengers on buses had been repealed.[6] The entire bulletin, quoted in full in Note 2 of the majority opinion (280 F.2d 533–534), shows that bus operators were to go no further than to "request the cooperation of such passenger in complying with Company rules to further the safe and peaceful handling of passengers." This request was to be made in a low voice and in a tactful manner. Reference was made,

4. "The custom, usage and policy of the Transit Company as to segregated seating on its buses paralleled the segregation policy of the city up to the time of the repeal of the sections referred to, but, beyond that, any implication of concert of action or conspiracy arising from the pursuit of common or parallel policies disappears in the light of the evidence to the contrary.

"The bus drivers had received definite instructions not to call the police in the event an incident such as here involved arose. For at least five years no agent, servant, or employee of the Transit Company had called the police for help in the enforcement of the Company's rule relating to seating. There is no evidence that prior to that time they were ever called. In each instance of difficulty voluntary compliance with the seating rule had been secured. * * * The evidence fails to reveal any col-

laboration on the part of any employee of the Transit Company in the prosecutions that followed, and it does not show any ratification thereof."

5. Section 1487–F of the Birmingham Code gave the right to promulgate rules and regulations for the seating of passengers to all "carriers of passengers for hire operating in the City of Birmingham." But certainly Transit had the right to make such rules and regulations without such a Code provision, so long as it performed no function for the State in their enforcement.

6. "In view of the repealing of ordinances having to do with the separation of passengers on buses, the following instructions are set forth in order that such operator will be relieved of the responsibility for problems that might possibly be encountered."

not to any ordinance, but "the reasonable rules that are now in effect with reference to seating in buses."

Based upon these facts and in the face of the finding by the court below which the majority opinion does not challenge, and without the citation of any authority,[7] the majority here concludes that the promulgation and enforcement by polite request only of the rule set forth in the bulletins quoted in the majority opinion constituted a denial of plaintiffs' constitutional rights. The paragraph epitomizing the majority's conclusion reads thus:

"Of course, the simple company rule that the Negro passengers must sit in back and white passengers must sit in front, while an unnecessary affront to a large group of patrons, would not effect a denial of constitutional rights *if not enforced by force or by threat of arrest and criminal action.* Where, as here, the city delegated to its franchise holder the power to make rules for seating of passengers and made the violation of such rules criminal, no matter how peaceable, quiet or rightful (as the court here held), such violation was, we conclude that the bus company to that extent became an agent of the State and *its actions in promulgating and enforcing the rule* constituted a denial of plaintiffs' constitutional rights." [Emphasis added.]

This language of the majority, applied to the facts in this case, in my opinion, required that the decision of the court below be affirmed, not reversed. In Shelley v. Kraemer it was only action by the *State Courts* taken at the instance of the parties to the deeds which was declared illegal. Here, the State took no action at the instance of the Transit Company. The Company was a business institution organized and operated to make a profit

---

7. The majority mentions Shelley v. Kraemer, 1947, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, but that case is authority for the appellee, not appellants. In fact, it was not listed as authority by appellants. That decision involved appeals from the Supreme Courts of Missouri and Michigan, wherein private parties had brought suits to enforce restrictive covenants in land deeds. These words are quoted from the Supreme Court's decision:

"These cases present for our consideration questions relating to the validity of *court enforcement* of private agreements, generally described as restrictive covenants, which have as their purpose the exclusion of persons of designated race or color from the ownership or occupancy of real property. * * * [334 U.S. 4, 68 S.Ct. 838]

"Since the decision of this Court in the Civil Rights Cases, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects *no shield against merely private conduct, however discriminatory or wrongful.*

"We conclude, therefore, that the restrictive agreements standing alone cannot be regarded as violative of any rights guaranteed to petitioners by the Fourteenth Amendment. So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated. * * *

"* * * The respondents urge that judicial enforcement of private agreements does not amount to state action; or, in any event, the participation of the State is so attenuated in character as not to amount to state action within the meaning of the Fourteenth Amendment. * * * [ib., 334 U.S. 13–14, 68 S.Ct. 842]

"The historical context in which the Fourteenth Amendment became a part of the Constitution should not be forgotten. * * * Upon full consideration, we have concluded that in these cases the States have acted to deny petitioners the equal protection of the laws guaranteed by the Fourteenth Amendment. * * *" [ib., 334 U.S. at p. 23, 68 S.Ct. at page 847] (Emphasis added.)

There the writings themselves were held to be not illegal. It was only the action of the State courts in enforcing the writings at the instance of one of the parties which the Supreme Court condemned as illegal.

for its owners. The only possible motive it could have had in promulgating the rule set forth in the majority opinion was to attract the maximum number of passengers by handling them in a peaceable manner and without friction and in a way most pleasing to its patrons. That is all it did. It sought no help from the State, and was attempting merely to seat its passengers in a way most beneficial to its own revenues and by polite request. There is no showing that any force would be attempted, or that the Transit Company would go any further than it had in previous years. It had never threatened the use of force, and never participated in the use of force, and it did not do so in this instance. The conclusion by the majority in the last quotation that its patrons "must" seat themselves as provided by the rule is not sustained by the language of the rule nor the evidence of the manner of its application.

The fact is that the police officers who used the force were not made parties to this action and that the court retained jurisdiction of the action insofar as it applied to the representatives of the State, the City Commissioners of Birmingham. They are not before the Court and the action taken by them is not before the Court. The appellants did not cross appeal from the action of the court below in retaining jurisdiction of this action insofar as it applied to the City Commissioners.

The mere existence of the city ordinance, with which appellee had no connection and which it did not seek to enforce and, as far as this record goes, never did intend to enforce, certainly cannot interfere with the application by appellee of its seating policy, accomplished, under the undisputed facts here, only by mutual consent. The situation here presented is much like that before the Supreme Court in the case of United States v. Raines, 1960, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524. A group of officials of the State of Georgia attacked the constitutionality of the Civil Rights Act of 1957 on the ground that, under its terms, enforcement *could* be had against private individuals as well as State officers. The action there involved was taken against State officers only. The Supreme Court declined to consider whether the Act would be applied to private individuals, because there were no private individuals involved in the litigation before it. Here is some of its language (362 U.S. at page 21, 80 S.Ct. at page 522):

"This Court, as is the case with all federal courts, 'has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' * * * Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional. * * * "

That case, in my opinion, controls this one. We do not have a situation where appellee used or threatened to use the newly adopted ordinance or to use force or threat of force in any form in the carrying out of its rule of voluntary seating. No other question is presented here.

The majority cites no authority for the proposition that, because a bus company is possessed of a franchise giving it the right to earn a profit from the use of the streets, the acts of the bus company are the acts of the State. Apparently it rests its announcement of this position upon Browder v. Gayle, et al. D.C.M.D.Ala. 1956, 142 F.Supp. 707, affirmed 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114, and Flemming v. South Carolina Electric &

Gas Co., 4 Cir., 1955, 224 F.2d 752. These cases do not, in my opinion, furnish any basis for the innovation the majority now seeks to import into the decision of civil rights cases.

In Browder the Montgomery City Lines, Inc. was admittedly enforcing State and municipal law requiring the segregation of races, compliance with which had been peremptorily demanded by the Alabama Public Service Commission in a written communication addressed to the Lines. Without dispute, it was acting in concert with the State of Alabama and the City of Montgomery in the enforcement of their laws, which the court declared unconstitutional. That holding does not touch the crucial point upon which this case has been decided. The evidence here shows without contradiction, and the court below found, that appellee was not engaged in enforcing any state law or city ordinance, but was seeking to give effect to its own private policy, established after the segregation ordinances had been repealed, and set forth in explicit terms in the two written bulletins quoted in the majority opinion. As I understand it, the majority does not take issue with this statement.

The same is true of Flemming.[8] The clear language of the Court of the Fourth Circuit shows that what the Court was there considering was completely outside the question now before us: "It is argued that, since the driver is made a police officer of the state by section 58–1494 of the South Carolina Code, his action is not attributable to the defendant; but we think it is clear that he was acting for the defendant in enforcing a statute which defendant itself was required by law to enforce. * * * He was thus not only acting for defendant, but also acting under color of state law." (224 F.2d 753)

The appellee here was not acting under any state power or any state law or color thereof, but was seeking solely to procure by persuasion and agreement observance of a policy which it manifestly felt would insure to it maximum revenues.

In my opinion, the majority goes outside the evidence and contrary to the findings of the trial court[9] in its statement (280 F.2d at page 535), "Where, as here, the City delegated to its franchise holder the power to make rules for seating of passengers and made the violation of such rules criminal, * * * we conclude that the Bus Company to that ex-

---

8. The per curiam opinion begins with these words: "This is an action for damages brought by a Negro woman against a bus company because the driver of the bus required her to change her seat in accordance with the segregation law of South Carolina * * * which she claimed to be violative of her rights under the 14th Amendment to the Federal Constitution."

9. The court below quoted the two bulletin orders No. 176 and 177, which Transit issued to its employees effective October 16th. A part of these two bulletins are for convenience copied here:

"As you have seen in the newspapers, the City Commission has unanimously repealed *all bus segregation ordinances* to become effective Thursday, October 16, 1958. Signs have been placed in front and rear of all of our buses which read as follows:

" 'White Passengers seat from front. Colored Passengers from rear.'

"Every effort should be used to avoid conflicting problems. May we suggest that you use calmness and your very best judgment in handling any situation that might arise. * * *

"In view of the repealing of ordinances having to do with the separation of passengers on buses, the following instructions are set forth in order that each operator will be relieved of the responsibility for problems that might possibly be encountered.

"If instances should arise wherein passengers *do not comply with the reasonable rules that are now in effect with reference to seating in buses* the operator will approach the passengers involved and talk with them in a tactful manner and in a low voice, and *request the cooperation of such passenger in complying with Company rules to further the safe and peaceful handling of passengers.*" [Emphasis added.]

tent became an agent of the State and its actions in promulgating and enforcing the rule constituted a denial of the plaintiffs' constitutional rights."

The majority reads into these rules, which by their language show clearly that they are rules of the Bus Company only, the idea that they were promulgated pursuant to the city ordinance. And the trial court found that the Bus Company was merely proceeding on its own [10] to insure a happy and peaceful relationship between its passengers, who by custom known to everyone, observed voluntary racial separation in all of the normal contacts between them. These findings of the court are not challenged by the majority as unsupported by evidence, or as being legally erroneous. They are the gist of this action, and they are, in my opinion, sound and their unexplained rejection by the majority is, in my opinion, completely without warrant.

## II.

The starting point of most reasoning on this subject is the Civil Rights Cases, 1883, 109 U.S. 3 et seq., 3 S.Ct. 18, 27 L.Ed. 835, declaring the Civil Rights Act of March 1, 1875 unconstitutional as not being authorized by the Thirteenth or Fourteenth Amendments. The cases discussed generally the correlative rights and powers of the States and of the national government. One of them, Robinson and Wife v. Memphis & Charleston R. R. Co., involved the right of the wife of a Negro to ride in the ladies' car. The full discussion of the questions before the Court in the dissent of Mr. Justice Harlan *asserted that the holding by the railroad of a franchise was a sufficient justification for federal intervention in connection with its said act of discrimination.*

Dealing with "the legal rights of colored persons in respect of the accommodations, privileges, and facilities of public conveyances, inns, and places of public amusement," the dissenting opinion (109 U.S. at pages 36–41, 3 S.Ct. at page 41) sponsors the position that the public nature of these businesses invests the persons performing them with attributes of State agency so that their acts come within the inhibitions of the Thirteenth and Fourteenth Amendments, suggesting the idea (109 U.S. at page 38, 3 S.Ct. at

10. "The custom, usage and policy of the Company as to segregated seating on its buses paralleled the segregation policy of the City up to the time of the repeal of the sections referred to, but, beyond that, any implication of concert of action or conspiracy arising from the pursuit of common or parallel policies disappears in the light of the evidence to the contrary.

"The bus drivers had received definite instructions not to call the police in the event an incident such as here involved arose. For at least five years no agent, servant, or employee of the Transit Company had called the police for help in the enforcement of the Company's rule relative to seating. * * *

"On the occasion in issue no one from the Transit Company called the officers. * * * *No one connected with the Transit Company instigated, directed, requested or participated in the arrests.* * * *

"Private parties, who may act independently with impunity, cannot escape liability where they actively assist agencies of a state government in depriving a person of rights guaranteed by the Fourteenth Amendment and the laws enacted thereunder. Although acting independently, a private party will also be liable if he acts under color of state law. On the other hand, it has been repeatedly held that the civil rights statutes do not have the effect of bringing under federal control private rights against invasion by individuals. * * *

"The customs of the people of a state is held not to constitute state action (See Williams v. Howard Johnson's Restaurant, 4 Cir., 268 F.2d 845; and Watkins v. Oaklawn Jockey Club, D.C.Ark., 86 F.Supp. 1006), and a custom is no more or less a custom because it finds expression in a formal rule. Whether segregated seating is secured by custom, policy or usage so long as its accomplishment is by voluntary adherence, divorced from state action, no violation of civil rights is presented. The fact that the custom has also found expression in an ordinance does not alter the principle stated. *Otherwise, independent individual action would be interdicted by the mere existence of the ordinance.* * * *" [Emphasis added.]

page 41) that "the real and personal property necessary to the establishment and management of the railroad is vested in the corporation; but it is in trust for the public."

Mr. Justice Bradley, speaking for the majority composed of the remaining eight members of the Court, rejected this argument in an extended opinion whose holdings may be summarized in a sentence found on page 14 of the report, 109 U.S., at page 23 of 3 S.Ct.: "In other words, it steps into the domain of local jurisprudence, and lays down rules for the conduct of individuals in society towards each other, and imposes sanctions for the enforcement of those rules, without referring in any manner to any supposed action of the state or its authorities." This rule of law has existed unimpaired to this day and the dissent of Mr. Justice Harlan has never found lodgement in subsequent cases. The case before us would escape the application of even this dissent since Transit had succeeded to no governmental rights or sanctions such as eminent domain, support by taxation, subjection to rate fixing and the like.

The Court below quoted an excerpt from Browder v. Gayle, 142 F.Supp. 707, 715, affirmed, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114, as supporting the views it expressed:

"In their private affairs, the conduct of their private businesses, it is clear that the people themselves have the liberty to select their own associates and the persons with whom they will do business, unimpaired by the Fourteenth Amendment. The Civil Rights Cases, 109 U.S. 3, * * * Indeed, we think that such liberty is guaranteed by the due process clause of that amendment."

The trial court also cited as supporting its holding the case of Garmon v. Miami Transit Company, D.C.1957, 151 F.Supp. 953, 955, affirmed per curiam by this Court, City of Miami, Florida v. Garmon, 5 Cir., 1958, 253 F.2d 428. The district court had held that the case was improperly brought against the Miami Transit Company and had dismissed the action as to said company.[11] The majority does not mention the Garmon case nor the quoted portion of the Browder case as the court below applied them, although I think under the trial court's handling of them they stand definitely athwart the path of the majority opinion here.

The majority does mention, without discussing beyond stating that they are not inconsistent with its present holding, two cases relied upon by the lower court, Eaton v. Board of Managers of James Walker Memorial Hospital, D.C.1958, 164 F.Supp. 191, affirmed 4 Cir., 261 F.2d 521, certiorari denied 359 U.S. 984, 79 S.Ct. 941, 3 L.Ed.2d 934; and Williams v. Howard Johnson's Restaurant, 4 Cir., 1959, 268 F.2d 845. I find the principles there involved sufficiently close to those before us here to warrant discussing them briefly.

Eaton involved an action by three Negro doctors representing a class and seeking admission to practice medicine at James Walker Memorial Hospital as members of the "Courtesy Staff." Soon after 1881 a hospital had been established in the City of Wilmington, Delaware upon land owned by the city, with expenses of operation being divided sixty per cent by the county and forty per cent by the city. In 1900, one James Walker offered to build a modern hospital and did build one on the site of the one which was torn down. The new hospital was incorporated under a chapter of the Private

11. Stating:
"* * * The decisions of the Supreme Court in civil rights cases of all types and kinds are directed to state (or city) officials acting in their official capacity and those decisions have not been directed to either private individuals or private business firms and indeed there is no constitutional prohibition affecting the freedom of private businesses to regulate their businesses within the law, nor is there any constitutional authority to impose upon them the burden to either enforce or not to enforce segregation in their private affairs."

Laws of 1901, with a board of managers, three of whom were appointed by the county, two by the city and four by said James Walker. The city and county conveyed the land to the board of management for hospital purposes.

At the outset the city and county paid the entire operating expense, but this was changed from time to time through 1951, after which support was furnished by private subscriptions, except for a per diem charge paid by city and county for charity patients. At the time of the filing of the action below only the county was paying said per diem charge for charity patients. The district court dismissed the action for lack of jurisdiction, and the Court of Appeals affirmed. It was not thought that the donation of the land for free use by the hospital, its quasi-public nature and the payments made by the county of part of the upkeep sufficiently identified the hospital with state action to warrant application of the Civil Rights Statutes.

Williams involved a suit by an employee of the United States against Howard Johnson's Restaurant, member of a chain of restaurants, for injunction and declaratory judgment based upon his claim that he was deprived of his constitutional rights by the application of Virginia's long established custom of excluding Negroes from public restaurants, and the enforcement of state statutes requiring segregation of the races in the facilities furnished by carriers and by persons engaged in the operation of places of public assemblage. A further claim was made that the restaurant was licensed by the State of Virginia, was situated along an interstate highway, and discriminated against Negroes in furnishing services to interstate passengers. The trial court dismissed the action for want of jurisdiction and the Court of Appeals affirmed.[12]

I agree with the action taken in each case, and I also agree with the conclusion of the court below here that the action taken in Eaton and Williams came nearer offending against the Civil Rights Acts than those involved in the present case. Here, the City of Birmingham had no connection with the operations of appellee, except that it issued a franchise or license to appellee to operate its buses along Birmingham's streets. Appellee performed no service which the City of Birmingham was under obligation to perform. All the city did was to pass an ordinance authorizing the appellees and all others carrying passengers for hire to promulgate rules of seating—a right Transit had without the ordinance. Race was not mentioned. Certainly the terms of the ordinance applied as much to white people as to colored people. The chief point is, however, that the appellee was not, as far as the proof goes, operating under the ordinance and that it took no part in the enforcement of the ordinance.[13]

It is clear, therefore, that the thrust of the majority's holding is that appellee deprived appellants of their constitutional rights when it requested that white people seat themselves from front to back and colored people from back to front, with no provision for enforcement of the request save the mutual consent of the parties. Such a conclusion carries with it necessarily the holding that segregation by agreement is unconstitutional. As far as I am advised, no court has ever made such a holding, and all of the decided cases have held the contrary.[14]

12. And see also Commonwealth of Pennsylvania et al. v. Board, etc. of Philadelphia, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792; In re Girard College Trusteeship, 391 Pa. 434, 138 A.2d 844 (Appeal to Supreme Court dismissed); and Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 17 U.S. 518, 4 L. Ed. 629.

13. The fact is that there is no proof that the prosecutions brought by the officers were under the ordinance. The court records touching the prosecutions of appellants were not introduced. Under the testimony of the police officers the charges against appellants were confined to "disorderly conduct," covered by another ordinance, and the court below so found.

14. A recent decision of this Court, Baldwin v. Morgan et al., 5 Cir., 287 F.2d 750, 760, quotes from the opinion of the district court then under consideration

It is noteworthy that it was left to a three-judge district court in this circuit (Browder v. Gayle, supra) to administer the *coup de grace* to Plessy v. Ferguson, 1896, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, a case directly in point with this one, decided by judges who had lived through the critical era following the War Between the States. The Supreme Court had been careful not to do that, saying in Brown v. Board of Education, 347 U.S. 483, 494–495, 74 S.Ct. 686, 692, 98 L.Ed. 873:

"Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, this finding [that segregation of white and colored children in public schools has a detrimental effect upon the colored children, engendering in them a sense of inferiority] is amply supported by modern authority. Any language in Plessy v. Ferguson contrary to this finding is rejected.

"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. * * * "

The "modern authority" listed by the Supreme Court as supporting this holding is confined to treatises upon psychology and social science, subjects which would hardly be considered in connection with a transportation case where children are not the parties primarily affected if affected at all.

And now it is this Court which takes this step, whose fundamental impact is further to debase the States and exalt the Federal Government in a very vital field.[15]

### III.

And whither now? Having bridged all the chasms and mounted all the hurdles in our leap from the shoulders of Browder—much too slender a reed to support so heavy a weight—to the conclusion here reached by the majority, what vistas do we open for those who need but slight justification to extend the doctrines with

this statement: "While no law, or custom or usage which is the equivalent of law, may compel the segregation of races in the area of public transportation, it is equally clear that people of good will of both races are free to observe traditions which for generations have been an intimate part of their way of life." And the same case refers to the decision of this Court in City of Montgomery, Alabama v. Gilmore, 5 Cir., 1960, 277 F.2d 364–368–370, where, in order that the people of that city might follow the "obvious but important truism that there is certainly no law to prevent cooperation between peoples of all races," the decree of the lower court was modified so as to dissolve the injunction it had granted.

And see also Cohen v. Public Housing Administration, 5 Cir., 1958, 257 F.2d 73, 78; Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F. 2d 230, 234; Kelley v. Board of Education of Nashville, etc., 6 Cir., 1959, 270 F.2d 209, 226; Dove v. Parham, D.C. Ark.1959, 181 F.Supp. 504, 513; Browder v. Gayle, D.C.Ala.1956, 142 F.Supp. 707, 715; Briggs v. Elliot, D.C.S.C.1955, 132 F.Supp. 776, 777.

15. The decision in Baldwin v. Morgan supra cites the case before us as au-

thority for the Baldwin decision, but it is certain that Baldwin does not tend to support Boman. This language used by the Court in Baldwin differentiates it from the facts before us here: "Here the statute infuses the Commission with power to prescribe that carriers shall maintain separate waiting rooms and this power has been effectuated by the issuance of regulations that leave nothing to the imagination. The last order compels the posting of visible signs clearly indicating which waiting room is for whites and which is for colored. The state does not physically post the signs, it does so just as effectively through the instrument of the Terminal. The very act of posting and maintaining separate facilities when done by the Terminal *as commanded by these state orders is action by the state.*"

Here, Transit was not acting under any order from the city and was not engaged in any cooperation with the city in the enforcement of any ordinance under which it might have been proceeding. Transit was engaged merely in persuading the members of the two races to cooperate with it in the observance of traditional patterns, obviously for the sole purpose of holding as much of the patronage of both races as it could.

which we are dealing? What about taxi-cabs, public haulers of household goods and property in general, vendors of hot tamales who peddle from their carts in the streets? They ply their trades only by obtaining a special license, a "franchise," from some agency of the state. And what of those who conduct their businesses for profit, only by obtaining special permits from a state agency to make deliveries over the public thoroughfares?

The answer is that the step from this decision to a declaration that all licensed dealers in merchandise or services in dealing with the public are engaged in business of such a public nature that their actions must be considered as actions of the states, is clearly comparable with the one the majority takes in the present decision. That the goal of those pressing for these drastic changes reaches far beyond what is here done is exemplified by a statement made by a Negro leader in a televised debate a few weeks ago.[16]

16. The public press carried excerpts from a debate conducted by the National Broadcasting Company over its television network on Saturday, November 26, 1960, between Reverend Martin Luther King, a Negro leader and President of the Southern Christian Leadership Conference, and Mr. James Kilpatrick, Editor of the Richmond News Leader and member of the Virginia Commission on constitutional government, with Mr. John K. M. McCaffery as Moderator. The stenographic transcript of this debate covers nineteen pages. A few excerpts from that transcript are reproduced here as representative of the attitude of those leading the so-called Sit-In Strikes as they relate chiefly to department stores operating lunch counters serving exclusively white patrons. Reverend King is quoted as saying in part:

"I would say that the sit-in demonstrations are justifiable because their ends are humanitarian, constructive and moral * * * I would be the first one to contend that there are certain sacred and basic rights that should be protected concerning private property, but I do not think this is the issue at this point. We are not dealing with property that is exclusively private. We are dealing with property that is privately owned but supported by, sustained by the public and

## IV.

The proper solution of the problem with which we are dealing can be reached only if we keep in mind that it is exclusively a social problem, with political overtones. The question is not whether appellants are entitled to seats which are equally as safe, comfortable, desirable and adequate as those which white people are requested by appellee to take (about which there is no dispute in the evidence); it is whether appellants are entitled to sit in the same seat or mingle in close contact with passengers who may not choose to have such association. Freedom of association and choice of social companions have always been considered among the things which cannot be enforced by judicial decree, cf. Baldwin et al. v. Morgan et al. supra. Such choices must be made in the hearts of men. A Negro leader from Chicago recently expressed the idea in these words:

"* * * no society nor government lifts a people, but they must

which depends on the public for its very existence, and I think we have a great difference here. * * *

"* * * I think in disobeying these laws, the students are really seeking to affirm the just law of the land and the Constitution of our United States. I would say this, that all people should obey just laws, but I would also say, with St. Augustine, that an unjust law is no law at all * * *"

When asked by Mr. Kilpatrick whether, if the Supreme Court should affirm the case of Williams v. Howard Johnson Restaurant, Reverend King and those led by him would abandon further efforts to sit-in, the latter responded in part:

"If the United States Supreme Court of the government of our nation issued a law, set forth a law or a decision stating that the public worship of God is unconstitutional, there would be a denial of the right of freedom of religion and to worship God publicly * * *"

Mr. Kilpatrick asked them to go back to the question whether Reverend King would be inclined to "call off all your troops and disband your school down there," if the Supreme Court should say that the sit-ins were illegal. Reverend King responded: "I go back to the argument, Mr. Kilpatrick, that an unjust law is no law at all."

struggle, sacrifice, and climb themselves." [17]

## V.

Since we are bound by no decisive legal precedent in deciding this case we should, in my opinion, consider all of the material facts and circumstances surrounding the socio-political problems with which we are dealing. Such an understanding and evaluation of what has happened in the past is necessary if we are to assess the components of this problem before us for solution in the present. There are those who do not subscribe to this view. Finding the present so unique in its problems, its thinking, and its attitudes, they are unwilling to devote prime attention to the accumulated wisdom of the ages. They think that to ponder upon the past is to give ear to the decadent and moribund.

It is my thought, and I believe the thought of the rank and file of the American people, that only by building upon the solid foundations of the past can true progress be made. If we abandon the past to achieve originality or modernity in a trifling sense, we forsake our heritage. We lose the advantage of all that has been learned at great cost over the ages, and start the struggle again from the bottom. I do not believe that recurrent haphazard or fortuitous change can be called progress; but that those who would completely discard the past and be completely contemporary do not believe in the possibility of real progress at all. Real progress can be achieved only by those who study the past and garner and enjoy and preserve what it has discovered and proceed to build upon it. There is no alternative but to start over again from the ape in every generation. Santayana has said words to the effect that those who do not study and are not willing to be guided by the past are destined to repeat the errors of the past; and Viscount Bryce said that everything that has power to win obedience and reverence must have its roots deep in the past.

1. The problem before us had its beginning when, as a war measure in the War Between the States, President Lincoln issued a proclamation freeing the Negro from slavery in which he had been bound. The bewildered Negro, save for the few years he had spent with the Southern white man, had no education or training except such as had come to him as a tribesman in the jungles of Africa. Under the leadership of white men of good intentions from the North, ignorant of conditions prevailing in the South, there began upon the death of President Lincoln a period which all Americans recall with sadness and shame, which Claude G. Bowers has so vividly described in his book "The Tragic Era."

Many of those at the forefront of that crusade were idealists and even clergymen who did not have a clear idea of the

---

17. Under the heading "Negro Baptist Leader Urges Racial Elevation," The Jackson Clarion-Ledger, Oct. 24, 1960, at page 7, reported a speech by the President of the National Baptist Convention thus:

"Dr. J. H. Jackson, president of National Baptist Convention, told a Jackson State College Founders' Day audience Sunday there is too much talk of 'racial integration' and not enough of 'racial elevation.'

"A record crowd at the 83rd Founders' Day program at College Park Auditorium heard the Chicago pastor and president of the Convention of four million Negroes speak on 'The Task of Racial Elevation.'

"He said that no society nor government lifts a people, but they must struggle, sacrifice, and climb themselves. 'The center of the responsibility is with us,' he said.

"Negroes must 'be bold and frankly face their own shortcomings,' they must 'develop the technique of appreciating themselves and their talents, and be proud of their race,' and they must realize the cause is greater than individuals in it. * * *

" 'It is difficult for a race to face those things we still must conquer,' he said. He added divisions among Negroes themselves still exist because they were brought from many tribes and cultures before they had a chance to unite as a race."

difference between "the things which be Caesar's," and "the things which be God's." (The same want of understanding has persisted in those groups until today.) Selfish politicians and conscienceless adventurers exploited the Negro and drove him to misdeeds of which under other circumstances he would not have been guilty. Finally, a saner viewpoint came upon the leaders in the North and, under the spur of sensible decisions by the courts, the Negro and the white man of the South were left, for a time and for the most part, to work out their destiny along lines of their own choosing. The courts particularly [18] assumed and performed their traditional role as the balance wheel, and tempered, or arrested altogether, the extreme actions under which the "carpetbaggers" were engaged in an effort, in defiance of the Constitution, to set the Negro up as ruler over the Southern white man.[19]

The areas where the white man and the Negro were left in near equal numbers have, from that day to this, labored under a problem of such magnitude and complexity that nobody who has not lived in intimate daily contact with it has ever been able to understand it. Its existence and compelling proportions have never been doubted by any who have taken the trouble to seek the truth or to cast their eyes about the world and what is going on in it today.

As different in ambition, in tastes, in aptitudes, in standards of behavior, and in culture as the pigments of their skins, they were left to compete for the products of a soil left barren and wasted by the red hoof of war. The advance made by the Negro in the face of these untoward circumstances transcends any ever achieved by any race under comparable circumstances in the annals of man. This has been possible because of the recognition by both of the essential differences between the two races, a patient and tolerant attitude towards those differences, and a determination to live and work side by side in the best manner the circumstances would permit.

No man has had a better understanding of the problem or a more honest attitude in speaking of it than William Alexander Percy. In the chapter entitled "Fode" of his book "Lanterns on the Levee," page 286, appears this paragraph, which sums up in a whimsical sort of way a good deal of the problem which necessarily exists where two races of so

18. See, e. g., Slaughter-House Cases, 1874, 16 Wall. 36, 83 U.S. 36, 21 L.Ed. 394; United States v. Reese, 1875, 92 U.S. 214, 23 L.Ed. 563; United States v. Cruikshank, 1875, 92 U.S. 542, 23 L.Ed. 588; Ex parte Virginia, 1880, 100 U.S. 339, 25 L.Ed. 676; United States v. Harris, 1882, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290; Civil Rights Cases, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835.

19. This action is brought under 42 U.S. C.A. §§ 1981 and 1983, two of the group of Civil Rights Acts concerning which the Supreme Court said, in Collins v. Hardyman, 1950, 341 U.S. 651, 656, 71 S. Ct. 937, 95 L.Ed. 1253 (cf. dissenting opinion in Sharp v. Lucky, 1958, 252 F. 2d 910, 913, 919) :
"The Act was among the last of the reconstruction legislation to be based on the 'conquered province' theory which prevailed in Congress for a period following the Civil War."
As demonstrated in the mentioned dissenting opinion, 252 F.2d at pages 916 et seq., statutes of this nature can be squared with the Constitution only when given a close and narrow construction. The quotations set forth at the pages mentioned apply with equal force here, including the words of Mr. Justice Jackson appearing in the Godkin Lecture he was preparing for delivery to the Harvard Graduate School of Public Administration at the time of his death (252 F.2d 910–911).
From Collins v. Hardyman, 341 U.S. 651, at page 657, 71 S.Ct. 937, at page 939, was reproduced in said dissent this language: "The Act * * * was passed by a partisan vote in a highly inflamed atmosphere. It was preceded by spirited debate which pointed out its grave character and susceptibility to abuse, and its defects were soon realized when its execution brought about a severe reaction."
The same words of caution apply, in my opinion, to the matter with which we are here dealing, and the same high statesmanship is called for in solving the problem before us.

many profound differences are forced by circumstance to occupy the same geographical area:

"The righteous are usually in a dither over the deplorable state of race relations in the South. I, on the other hand, am usually in a condition of amazed exultation over the excellent state of race relations in the South. It is incredible that two races, centuries apart in emotional and mental discipline, alien in physical characteristics, doomed by war and the Constitution to a single, not a dual, way of life, and to an impractical and unpracticed theory of equality which deludes and embitters, heckled and misguided by pious fools from the North and impious fools from the South—it is incredible, I insist, that two such dissimilar races should live side by side with so little friction, in such comparative peace and amity. This result is due solely to good manners. The Southern Negro has the most beautiful manners in the world, and the Southern white, learning from him, I suspect is a close second."

2. A brief résumé of some of the decisions of the courts in respect to the Fourteenth Amendment and the relationship between the races during the last three decades of the nineteenth century and the first five of the twentieth is necessary to an understanding of the many-sided problem presented by the case before us and the attitudes of the people involved which, in the end, will play the major part in its solution.

3. Thomas Jefferson wrote in the Declaration of Independence these words which have always been accepted as basic under the American System: "That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed * * *." During its entire life, it has been conceded that the Real Governor of the American People is public opinion.

For all practical purposes, the "Governed" are the people of the Deep South who live in areas where the two races approach equality in numbers. Of transcendent importance, therefore, is their attitude with respect to the socio-political problem which is before us.

### VI.

The attitude of the "Governed" towards problems such as that before us rests at bottom upon the firm assurance they received from the courts of the land over a period of eight decades before Brown sprang Pallas-like full-fledged from the Jovian forehead of the Supreme Court.

As far back as 1878 [20] Judge William B. Woods, appointed two years later as a Justice of the Supreme Court of the United States, had written for the United States Circuit Court for Louisiana: "The state, while conceding equal privileges and advantages to both races, has the right to manage its schools in the manner which, in its judgment, will best promote the interest of all. * * * Any classification which preserves substantially equal school advantages does not impair any rights and is not prohibited by the Constitution of the United States. Equality of rights does not necessarily imply identity of rights." In 1882, the United States Circuit Court for the Southern District of Ohio [21] upheld the separate but equal doctrine. In 1896 came Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, in which only Mr. Justice Harlan dissented. The case involved separate facilities in transportation. It is the case whose principles, as applied to education, were repudiated by the Supreme Court in Brown v. Board of Education infra. There it was said (163 U.S. at page 551, 16 S.Ct. at page 1143):

"We consider the underlying policy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races

---

20. Bertonneau v. Board of Directors of City Schools et al., 3 Fed.Cas. page 294, No. 1361, 3 Woods 177.

21. United States v. Buntin, 10 F. 730.

stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it. * * * The argument also assumes that social prejudices may be overcome by legislation, and that equal rights cannot be secured to the Negro except by an enforced commingling of the two races. We cannot accept this proposition. *If the two races are to meet upon terms of social equality, it must be the result of natural affinities, a mutual appreciation of each other's merits and a voluntary consent of individuals.* As was said by the Court of Appeals of New York in People v. Gallagher, 93 N.Y. 438, 448, 'this end can neither be accomplished nor promoted by laws which conflict with the general sentiment of the community upon whom they are designed to operate. * * *' Legislation is powerless to eradicate racial instincts or to abolish distinctions based upon physical differences, and the attempt to do so can only result in accentuating the difficulties of the present situation. * * *" [Emphasis supplied.]

Three years after Plessy, Mr. Justice Harlan indicated ostensibly that he did not think that what he had said dissenting therein was applicable to a suit involving public schools. He affirmed the action of the Supreme Court of Georgia in holding that the failure to provide a high school for Negroes did not justify the holding under the Fourteenth Amendment that money raised by general taxation could not be used to maintain a high school for white students only.[22]

In 1927, the Supreme Court held in Gong Lum et al. v. Rice, et al., 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172, that a child of Chinese blood born in and a citizen of the United States is not denied the equal protection of the laws under the Fourteenth Amendment by being forced to go to a colored school rather than a white school. A state circuit court of Mississippi had granted mandamus against the Mississippi school authorities "commanding them and each of them to desist from discriminating against her on account of her race or ancestry and to give her the same rights and privileges that other educable children between the ages of five and twenty-one are granted in the Rosedale Consolidated High School." The Supreme Court of Mississippi reversed the case[23] on the ground that a school for colored children was maintained in the county of the young lady's residence and that, being a Mongolian, she was classified as colored. The basis of this decision was that, although the young lady had, solely because of her race, been denied the right to attend a school for white children, this action did not violate her rights under the Fourteenth Amendment.

This quotation from that opinion (275 U.S. at pages 85-87, 48 S.Ct. at page 93) demonstrates that its holding is susceptible of no other construction:

"The right and power of the state to regulate the method of providing for the education of its youth at public expense is clear. In Cumming v. Richmond County Board of Education, 175 U.S. 528, 545, 20 S.Ct. 197, 201, 44 L.Ed. 262, *persons of color* sued the Board of Education to enjoin it from maintaining a high school for white children without providing a similar school for colored children which had existed and had been discontinued. Mr. Justice Harlan in delivering the opinion of the Court, said:

" 'Under the circumstances disclosed, we cannot say that this action of the state court was, within the

---

22. Cumming v. Richmond County Board of Education, 1899, 175 U.S. 528, 20 S. Ct. 197, 44 L.Ed. 262. Extensive quotation from the case appears infra.

23. Rice v. Gong Lum, 139 Miss. 760, 104 So. 105.

meaning of the Fourteenth Amendment, a denial by the State to the plaintiffs and to those associated with them of the equal protection of the laws, or of any privileges belonging to them as citizens of the United States. We may add that while all admit that the benefits and burdens of public taxation must be shared by citizens without discrimination *against any class on account of their race,* the education of the people in schools maintained by state taxation is a matter belonging to the respective States, and any interference on the part of Federal authority with the management of such schools can not be justified, except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land.'

"The question here is whether a Chinese citizen of the United States is denied equal protection of the laws when he is *classed among the colored races and furnished facilities for education equal to that offered to all, whether white, brown, yellow or black.* Were this a new question, it would call for very full argument and consideration, but we think that *it is the same question which has been many times decided to be within the constitutional power of the state legislature to settle without intervention of the federal courts under the Federal Constitution.* Roberts v. City of Boston, 5 Cush. (Mass.) 198, 206, 208, 209; State ex rel. Garnes v. McCann, 21 Ohio St. 198, 210; People ex rel. King v. Gallagher, 93 N.Y. 438; People ex rel. Cisco v. School Board, 161 N.Y. 598 [56 N.E. 81, 48 L.R.A. 113]; Ward v. Flood, 48 Cal. 36, 17 Am. Rep. 405; Wysinger v. Crookshank, 82 Cal. 588, 590, [23 P. 54]; Reynolds v. Board of Education, 66 Kan. [672] 674, [72 P. 274]; McMillan v. School Committee, 107 N.C. 609 [12 S.E. 330, 10 L.R.A. 823]; Cory

v. Carter, 48 Ind. 327, 17 Am.Rep. 738; Lehew v. Brummell, 103 Mo. 546 [15 S.W. 765, 11 L.R.A. 828]; Dameron v. Bayless, 14 Ariz. 180 [126 P. 273]; State ex rel. Stoutmeyer v. Duffy, 7 Nev. 342, 348, 355, 8 Am.Rep. 713; Bertonneau v. Board, 3 Woods 177, 3 Fed.Cas. 294, Case No. 1,361; United States v. Buntin [C.C.], 10 F. 730, 735; Wong Him v. Callahan [C.C.], 119 F. 381.[24]

"In Plessy v. Ferguson, 163 U.S. 537, 544, 545 [16 S.Ct. 1138, 1140, 41 L.Ed. 256], in upholding the validity under the Fourteenth Amendment of a statute of Louisiana requiring the separation of the white and colored races in railway coaches, a more difficult question than this, this Court, speaking of permitted race separation, said:

" 'The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power even by courts of States where the political rights of the colored race have been longest and most earnestly enforced.'

"The case of Roberts v. City of Boston, supra, in which Chief Justice Shaw of the Supreme Judicial Court of Massachusetts announced the opinion of that court upholding the separation of colored and white schools under a state constitutional injunction of equal protection, the same as the Fourteenth Amendment, was then referred to, and this Court continued:

" '*Similar laws have been enacted by Congress under its general power of legislation over the District of Columbia,* (Rev.Stat.D.C. §§ 281, 282, 283, 310, 319), as well as by legislatures of many of the States, and have been generally, if not uniform-

---

24. Cf. also Berea College v. Commonwealth of Kentucky, 211 U.S. 45, 29 S. Ct. 33, 53 L.Ed. 81, and Dawson v. Lee, 83 Ky. 49.

ly, sustained by the courts,' citing many of the cases above named.

· "Most of the cases cited arose, it is true, over the establishment of separate schools as between white pupils and black pupils, *but we can not think that the question is any different or that any different result can be reached, assuming the cases above cited to be rightly decided, where the issue is as between white pupils and the pupils of the yellow races. The decision is within the discretion of the state in regulating its public schools and does not conflict with the Fourteenth Amendment. The judgment of the Supreme Court of Mississippi is Affirmed."*

(Emphasis supplied.)

It appears to me, and I think to the vast majority of the lawyers of this country, that the decision of the Supreme Court in Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, is a direct rejection and overruling of Gong Lum v. Rice and the cases upon which that decision was based.[25]

It was not necessary, therefore, to "turn the clock back to 1868 when the amendment was adopted, or even to 1896 when Plessy v. Ferguson was written," but only to 1927 when the Supreme Court laid down the principles of Gong Lum as "the law of the land." It is nowhere intimated that "psychological knowledge" was not as extensive and accurate in 1927 as it was in 1954. The "governed" are of the belief, therefore, that the Supreme Court, based upon assumed psychological knowledge alone, changed the "law of the land" and repudiated principles which had formed the basis of action upon which the citizenship of a considerable portion of this nation had built up a happy and productive civilization under

handicaps as great as ever faced any people; and that the Supreme Court was without just power, under the American System, so to do.[26]

## VII.

A brief look at the years intervening between Gong Lum and Brown will disclose an interesting background for the violent change of front. The former was rendered during the period of transition following World War I. President Woodrow Wilson had been accustomed to say to his intimates, as well as in public, that the greatest worry brought to him by the presidency was whether he would have the character and determination to give back to the States and to the people, voluntarily and ungrudgingly, the powers belonging to them which had been yielded to serve the grim necessities of war. Since the beginning of time, peoples have had a tendency to go voluntarily into dictatorships to fight a war. Fate decreed that Mr. Wilson should not have the opportunity to see that these powers were returned to the States and to the people.

Everyone knows that quite the contrary took place. The bureaus and administrative agencies, fashioned to carry out these powers, set a practice which has furnished a pattern which subsequent bureaus have avariciously followed. The first thing each did was to establish a department of publicity and propaganda which, without any attempt at modesty, would set about to charm the people into believing that the retention of these centralized powers by the federal government and their rapid expansion were indispensable to the welfare of the country and the states. The printed page and the air waves have been kept filled with these slanted claims from that day to this.

Soon after Gong Lum began the Great Depression; followed World War II and

25. See the long list of articles by distinguished lawyers and judges discussed infra.

26. Gong Lum was written by Chief Justice Taft, one of the great statesmen and judges of our history. With him were Associate Justices Oliver Wendell

Holmes, Louis D. Brandeis and Harlan Fiske Stone, who rank among the greatest liberals ever to occupy positions on our highest court. Justice Holmes had been a Union soldier in the War Between the States. The decision was unanimous.

the Korean "Police Action." Then ensued the Cold War in whose grip the nation still remains. All of these eras of crisis have tended inevitably towards centralization of power in the Federal Government and a consequent robbing of the States of the rights retained by them in the Constitution.

This period of centralization and the climate which attended it spawned a group of minorities whose adherents and whose influence from the start has grown by leaps and bounds. The slogan of "Tax, Spend, Elect" brought smiles as well as power to the politicians. Equally powerful was the voice of the minorities, which under the benign aegis of those in political control rapidly grew sleek and fat and powerful so they have unblushingly boasted that no national election can be carried without their support. That the boast is not an idle one is readily revealed in contemplation of their closely knit organization and their possession of such funds that they can spend more money in a national election than all the political parties combined. Statisticians can demonstrate that most of the national elections since 1936 have been carried by top-heavy majorities in less than a dozen big cities where these minorities have flourished and applied their greatest pressures.

One of the accepted phenomena of the period has been the solid bloc voting by Negroes in these cities. Raymond Moley's commentary [27] refers to the power of this vote and some of the dangerous features inherent in it.[28]

This powerful minority has demonstrated its effectiveness in obtaining favorable treatment by all departments and segments of government. It has, moreover, so propagandized and pressured the Negroes of the South that their true leaders have found it extremely difficult to make themselves heard above the strident voices which flood it from other sections of the nation.

There is a tendency, joined in by a few politicians in the South, to criticize what

27. Human Events, Dec. 1, 1960, Vol. XVII, No. 48–Sec. V.

28. " * * * It might be a good year for enlightened Americans to call attention to the sordid practices of politicians of both parties who regard the Negro as a political pawn. No one should demand this with more fervor than Negro leaders who are not presently in politics.

"It is already time that Negroes who have made such great progress in education and economic status should demand that they be treated in the appeals of politicians as citizens of the United States who have concerns other than those which affect them solely as members of a race. We are all equally concerned over foreign affairs, the stability of our income, and with cultural progress of all kinds.

"In every great city it has been revolting to see political leaders of both parties bid for a solid Negro vote. In New York four governors in the past 20 years—Lehman, Dewey, Harriman and Rockefeller—have treated the Harlem votes as special cases. * * *

"In the campaign now completed, the appeal to the Negro as a member of a race and not as an American citizen was especially pronounced. His vote was regarded as 'pivotal.' In the magazine Jet there was a calculation of how the election could be decided by special appeals to the very considerable Negro minorities. The numbers cited by Jet were: New York 775,000; Illinois 510,000; Pennsylvania, 460,000; California, 450,000; Ohio 400,000; Michigan, 350,000. It is unfortunate for the Negro himself that these large blocs of votes should be regarded as the balance of power. For nothing so intensifies prejudice as the assumption that members of any minority vote as a bloc.

"I once heard the distinguished Rabbi Wise say in his pulpit that the moment there was a 'Jewish vote,' there would be an anti-Jewish vote. The concept of classes, whether they be based upon race, religion, or economic status, is repugnant to the whole spirit of America. To consider them as such is to usher in what might be called 'political tribalization.'

"Ultimately, such reliance upon class voting will destroy the reality of a two-party system. For each party will be divided into classes and factions.

"Never was a national unity, with a broad national spread of both parties into small groups, needed as much as now. It is time to end the concept of any group as a political pawn."

is classified as a practice of the South to set itself apart from the nation because of its own peculiar problem. The fact is that the South is given no alternative. Hardly a political campaign begins in certain sections of the nation on any other note than one designed to capture the Negro vote by making the South the whipping-boy of their campaigns for election. In no other segment of American life is there so constant a campaign to gain votes in their own sections by essaying to act as savior for the Negroes in the South in whom they could have nothing more than a nominal interest.

## VIII.

In spite of the propaganda and the resultant indoctrination of people generally with the ideas emanating from Washington and from the minority groups, the Supreme Court for a while proceeded to observe precedent and to strike down some of the legislation which it felt to be the product of an over-zealous president and Congress.[29]

This trend under which the Supreme Court was holding a brake on the actions of the Congress and the Executive soon came, however, to a rather abrupt end. Shortly after President Roosevelt had been reelected by an almost unanimous vote of the Electoral College, he sent to Congress February 5, 1937, his Reorganization Plan for the Supreme Court, commonly referred to as the "Court Packing Plan." There was promptly introduced in the Senate a bill known as S–1392 of the Seventy-fifth Congress, which was the source of earnest and extended debate from that time until it was recom-

mitted to the Senate Judiciary Committee July 22, 1937. The President had asked the right to appoint an additional number of Supreme Court Judges with the frank admission that his purpose was to place upon the Court a sufficient number of judges whose minds were slanted towards the objectives he was seeking so that they might out-vote the members of the Court who were of another school of thought and who were instrumental in declaring unconstitutional some of the congressional action he had recommended.

The Supreme Court Packing Bill was followed shortly by a reversal of attitude on the part of the Supreme Court. One of the first principles to fall related to freedom of contract, which the Court had diligently guarded,[30] but which was set aside upon the change of the vote of one judge by the five to four decision in West Coast Hotel Co. v. Parrish, 1937, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703.

The Court had [31] voided the Bituminous Coal Conservation Act of 1935 on the ground that it was an attempted regulation of the production of coal on the theory that this was a regulation of interstate commerce. But that holding was soon cast into the limbo.[32]

The drastic change in the approach to constitutional questions is intelligently discussed in an article by Thomas Raeburn White of the Pennsylvania Bar.[33] The cases by which the change was effected are collected in that publication, and no good purpose will be served by listing them here. These words quoted from the article merit serious consider-

29. E. g., Panama Refining Co. v. Ryan, 1935, 293 U.S. 388, 55 S.Ct. 241, 79 L. Ed. 446, dealing with the petroleum industry under the National Industrial Recovery Act; Railroad Retirement Board v. Alton Railroad Co., 1935, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468, voiding the Railroad Retirement Act; and Louisville Joint Stock Land Bank v. Radford, 1935, 296 U.S. 661, 56 S.Ct. 82, 80 L. Ed. 471; Humphreys, Executor v. United States, 1935, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611, and Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570.

30. Adkins v. Childrens Hospital, 1923, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785.

31. Carter v. Carter Coal Co., 1936, 298 U. S. 238, 56 S.Ct. 855, 80 L.Ed. 1160.

32. Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263.

33. "Construing the Constitution: The New 'Sociological' Approach," American Bar Association Journal, December, 1957, Vol. 43, No. 12, p. 1085 et seq.

ation: "Undoubtedly the cries of the distressed, the rumblings of discontinent, the demands of the agitator and the politician penetrate, like the sound of many waters, even into the quiet of the judicial chamber, and it cannot be doubted affect the minds of the judges. * * *

"President Roosevelt even went so far as to claim that what he called 'The Supreme Court Fight' caused the Court to change its decisions. * * *

"In Colliers for September, 1941, appears an article entitled 'The Fight Goes On' in which he wrote concerning the changed attitude of the Court: 'The court yielded. The court changed. The court began to interpret the Constitution instead of torturing it. It was still the same court with the same justices. No new appointments had been made. And yet beginning shortly after the message of February 5, 1937 (proposing the court packing plan). What a change * * * it would be a little naive to refuse to recognize some connection between these decisions (overturning earlier decisions) and the Supreme Court fight.' [34]

"The serious question which confronts us now is whether constitutional government has broken down. *Whether the American theory that tried and true principles of government may be enshrined in a written constitution and entrusted to the courts for their protection, has proved to be illusory.* * * *

"If it be admitted that the Court may change the Constitution by construction whenever it sees a need therefor, constitutional government as we have known it and as it was visualized by its founders has indeed ceased to exist.[35]

"The reputation of the Supreme Court has suffered certainly in the opinion of the legal profession and probably more generally by reason of its instability as shown by the frequent overruling of its own recent decisions, caused largely by changes of opinion of individual judges, its disregard of precedents which were believed to have settled the law, and most of all by a method of construing the Constitution to attain a desired object, although in effect the Constitution is amended and the balance of power between the Federal Government and the states seriously disturbed." [36] [Emphasis added.]

The ideas thus expressed are carried forward in a dissertation by H. Gifford Irion.[37] The author deals with the decision of the Supreme Court in Brown v. Board of Education [38] and, near the beginning, states in a note: [39]

"There has been a somewhat curious position taken by editors and others who oppose segregation. In effect, they have said 'the court has spoken and therefore all debate is at an end.' One needs only to observe that if this dogmatic acceptance of a Supreme Court decision had always been part of our legal history, we should still be living with unregulated child labor and many other things now considered archaic. Had the Republican Party been pledged to such an attitude, the Dred Scott [Scott v. Sandford, 19 How. 393, 60 U.S. 393, 15 L.Ed. 691] decision would have remained 'the law of the land' and the abolition of slavery would have had to await the slow enlightenment of individual states. Actually, a Court pronouncement may be only the beginning of an argument." Proceeding, the author says:

"The significance of the decision * * extends far beyond its actual effect upon the matter of segregation to its potential influence upon future interpretations of the Constitution. This element—so grossly underplayed—arises from the

---

34. Ib. p. 1152, including Note 54.

35. Ib. p. 1154.

36. Ib. p. 1155.

37. LL.B George Washington University, Member of the District of Columbia and Commonwealth of Virginia Bars, The Georgetown Law Journal, Vol. 46, No.

3, Spring 1958, p. 443 et seq. entitled "The Constitutional Clock: A Horological Inquiry."

38. 347 U.S. at page 494, 74 S.Ct. at page 691.

39. The Georgetown Law Journal, supra, at page 443.

fact that the Court, in reaching this decision, employed a new method of judicial determination, a method which must be studied and debated with intense seriousness.

"'[W]e cannot turn the clock back,' said the Chief Justice. It was a ringing phrase; one which caught up the imaginative fire of all those who profess that tradition is a bondage from which mankind must escape. * * * 40

"Clearly, the critical point in this reasoning was reached when the Court found that segregation had an adverse effect upon Negro children. Without this, the conclusion could not possibly have proceeded with any pretense at logic. Consequently, it is of the utmost importance to ascertain the technique by which so far-reaching a constitutional change was made. The intangible factors relied upon by the Court were the presumed feeling of inferiority by those who were educated separately and the detrimental effect segregation had upon their educational and mental development. The evidence of these intangibles consisted of one quotation from the Kansas court which had ruled against the Negro plaintiffs below, and a footnote listing a number of works on psychology and sociology. With one fell swoop the Court then jettisoned the separate but equal doctrine. It declared that separate facilities are inherently unequal * * * [Rejecting the decision in Plessy v. Ferguson, supra, insofar as it applied to education.]

"It is impossible to read this portion of the opinion without concluding that a constitutional doctrine which had endured for fifty years was cast into limbo on the authority of sociological writings which were accepted as beyond dispute. Regardless of the validity of these writings the genuinely serious issue is whether it is proper to rely upon such sources in resolving constitutional questions. * * *

"* * * The winding road between Adkins v. Children's Hospital and West Coast Hotel Co. v. Parrish [supra] * * reveals the temptation offered under the fourteenth amendment for the shaping of decisions by personal philosophy. * * * throughout the history of these decisions certain landmarks were established and, equally important, certain judicial methods of interpretation were followed, however erroneously in individual cases. * * * This has been done, however, with the utmost caution and after a careful examination of all the arguments. Needless to say, such reversals have been expressed with the most faithful regard for the established canons of constitutional interpretation (Citing Pollock v. Farmers' Loan & Trust Co., 1895, 157 U.S. 429 [15 S.Ct. 673, 39 L.Ed. 759], and West Coast Hotel Co. v. Parrish, 300 U.S. 379 [57 S.Ct. 578, 81 L.Ed. 703].) 41

"We have seen in the Brown case that the Court rejected in a rather summary fashion the purpose and intent of the framers of the fourteenth amendment by saying that the historical data were inconclusive. Mr. Alexander M. Bickel (79 Harv.L.Rev. 1, 1955), who is now an assistant professor at Yale, has performed a splended piece of scholarship in reviewing the debates on the fourteenth amendment in his article on the segregation decision. It was his considered judgment that the original understanding of the framers was 'anything but conclusive' and that integrated schooling was not one of the matters they had in mind among the civil rights they were insuring * * * 42

"The men who fashioned the fourteenth amendment represented varying shades of opinion including the extreme egalitarianism of the Radicals. The Radicals capitulated, however, in their demands in order to get support from the Moderates. In no other way could the amendment have been put through. It seems ironic that we should deliberately interpret the instrument in a manner which the majority of our ancestors did not wish and which, had they foreseen

40. Ib. 443.

41. Ib. 446.

42. Ib. 447.

the future, would probably have caused them to act otherwise.

"There is, however, a greater cause for concern about the rationale of the Court in the Segregation Cases. As noted before, the crux of the decision lies in its reliance upon contemporary sociology. It can scarcely be disputed that such studies as sociology and psychology are not 'exact sciences' within any reasonable meaning of that term. Schools of opinion blossom and fade. Each apostle tends to attract a group of followers and these, in turn, tend to follow individualistic lines which often result in the establishment of new schools. * * * Few would dispute the fact that some areas of the South have distinct sociological problems of their own with respect to integration. There is no logical reason why these should not be pleaded to show that the clock has not moved as fast—or in the same direction—as in other areas. If it is true, as the Court has suggested, that our national social development has reached a point where new visions are opened under the Constitution, it must also be conceded that this, at best, represents an average or median. It is just as reasonable to say that where such social conditions are radically different, new constitutional insights do not apply.

"The trouble with this *modus operandi* is that it not only leaves much to conjecture, but also that it could be applied to substantiate theories contrary to our concept of democracy. The Third Reich affords an extreme and tragic example of this. All of us remember how Hitler was always able to commandeer social scientists to support the Nazi theses. Can we be certain that something at least approximately similar could never happen here? There is at least a suggestion in history that scientific theories, especially in those areas of human relations where no yardstick has been devised to aid the struggling scientist, are subject to rapid and unpredictable fluctuations. Under such conditions the conscientious social scientist may invite our sympathy but does he command our blessings as an arbiter of constitutional doctrine? [43]

" * * * But this is quite a different thing from making the Constitution into a kind of automatic timepiece which goes off whenever the heralds of a new era have spoken. In resolving these questions the nature and basic mechanism of the constitutional clock should be fully considered. * * *

" * * * But the classical exponents of neither school [that is, the strict school and the liberal school] would concede that the Constitution was to be read in terms outside its 'explicit' or 'implicit' provisions. * * * The approach in the Segregation Cases seems novel in that it appears to repudiate that rule in order to accept current—and possibly transitory—sociological findings. * * * [44]

" * * * The turning point of the decision [Brown], it would seem, was when the Court found that as a result of segregation Negro children suffered from a sense of humiliation. Whether this evil would be remedied by thrusting them into a school with white children is open to serious question. There can be very little doubt that young people are peculiarly gifted at devising means for ostracizing those whom they regard as undesirable. No judicial process is required nor is it necessary to resort to anything so uncouth as violence. Yet the undesired individual can still be cast into outer darkness with complete effectiveness. If tactics such as these are used, shall we nevertheless assume that the federal government has a role to perform in protecting its citizens from humiliation? * * * [45]

"The last, and most important, matter relates to the very nature of the judiciary. Chief Justice Marshall said [Osborn v. Bank of United States (9 Wheat. 738), 22 U.S. 738, 866 (6 L.Ed. 204) (1824) ]: 'Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instrument of the law, and can will noth-

43. Ib. pp. 448–449.
44. Ib. 450–451.

45. Ib. 455.

ing.' For generations the proposition has been accepted that courts decide only the questions before them in a contested case and, though lasting principles necessarily emerge from such decisions, they do not come by virtue of any power within the judicial process to formulate policy. * * * No one [speaking of Mr. Justice Holmes] has ever been more loyal to the concept of limitation on judicial power than he. It was the very essence of his philosophy, repeated time after time, that judges should not superimpose their personal economic and other opinions on legislation. [Lockner (Lochner) v. New York, 198 U.S. 45 (25 S.Ct. 539, 49 L.Ed. 937) (1905) ]." [46]

A good statement against the right of the Supreme Court to substitute its notions at the time being of what constitutes natural justice for the limitations imposed by the Constitution is found in the dissenting opinion of Mr. Justice Black (including the appendix) in Adamson v. People of State of California, 1947, 332 U.S. 46, 90 et seq., 67 S.Ct. 1672, 1695, 91 L.Ed. 1903:

"Conceding the possibility that this Court is now wise enough to improve on the Bill of Rights by substituting natural law concepts for the Bill of Rights, I think the possibility is entirely too speculative to agree to take that course. * * *

" * * * But this formula also has been used in the past, and can be used in the future, to license this Court, in considering regulatory legislation, to roam at large in the broad expanses of policy and morals and to trespass, all too freely, on the legislative domain of the States as well as the Federal Government.

"An early and prescient exposé of the inconsistency of the natural law formula with our constitutional form of government appears in the concurring opinion of Mr. Justice

Iredell in Calder v. Bull, 3 Dall. 386, 398, 399 [1 L.Ed. 648]: 'If any act of Congress, or of the Legislature of a state, violates * * * constitutional provisions, it is unquestionably void; though, I admit, that as the authority to declare it void is of a delicate and awful nature, the Court will never resort to that authority, but in a clear and urgent case. If, on the other hand, the Legislature of the Union, or the Legislature of any member of the Union, shall pass a law, within the general scope of their constitutional power, the Court cannot pronounce it to be void, merely because it is, in their judgment, contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard; the ablest and purest men have differed upon the subject; and all that the Court could properly say, in such an event, would be, that the Legislature (possessed of an equal right of opinion) had passed an act which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice.' [47]

" * * * to invalidate statutes because of application of 'natural law' deemed to be above and undefined by the Constitution is another [thing]. 'In the one instance, courts proceeding within clearly marked constitutional boundaries seek to execute policies written into the Constitution; in the other they roam at will in the limitless area of their own beliefs as to reasonableness and actually select policies, a responsibility which the Constitution entrusts to the legislative representatives of the people.' Federal Power Commission v. Natural Pipeline Co., 315 U.S. 575, 599, 601, note 4, 62 S.Ct. 736, 86 L.Ed. 1037.

"Mr. Justice Douglas joins in this opinion."

46. Ib. 456–457.

47. See Note 18, on page 91, of 332 U.S., on page 1696 of 67 S.Ct.

This general subject is dealt with in another article appearing in the American Bar Association Journal: [48]

"The Court [in the Segregation Cases] does not say in so many words that it adheres to the dogmas of 'natural law', but these school cases are not the first in which natural law considerations have played a decisive part. They give comfort to those who believe that the eternal verities should take precedence over the written law, and they are disturbing to those who prefer a written constitution. Progressive modification by the judges of the judge-made common law is a very different thing from abruptly changing a written constitution. If the eternal verities as revealed through the writings of Gunnar Myrdal are to outweigh the words written in the constitution, the concept of the constitution as a solemn and binding contract is destroyed. * * *

" * * * 'Since we must rest our decision on the Constitution alone, we must set aside predilections on social policy and adhere to the settled rules which restrict the exercise of our power to judicial review—remembering that the only restraint upon this power is our own sense of self-restraint.' [49]

"The alarming significance of the school cases extends beyond the immediate decisions. Never before have the personal predilections and moral certainties of the Justices ridden so rough-shod over the text of the written Constitution. The Court has found that the moral law which impels it to advance the interests of colored people outweighs the moral law which teaches that a judge who has sworn to uphold a constitution ought to uphold it."

The author then illustrates his point by supposing that two baseball teams were tied in the last inning of the World Series and the umpire is morally convinced that the Yankees ought to win. The Yankee runner is tagged with the ball forty-five feet from the home plate, and the umpire, acting on his understanding of the precepts of natural law, rules that the runner is safe at home. Those who bet on the Dodgers are then confronted with the problem of whether the moral law requires them to pay their bets. He closes with this question, which he answers himself:

"Does the decision of the umpire prevail over the rules of the game? One of the rules of the game is that both teams shall obey the decision of the umpire; and the umpire has promised to stick to the rule book."

It is not surprising to find the great Learned Hand questioning the wisdom of Brown and the power of the Court to render it.[50] Apparently finding himself unable to understand the source of power claimed by the Supreme Court in the rendition of this decision, he states (page 73): "For myself it would be most irksome to be ruled by a bevy of Platonic Guardians, even if I knew how to choose them, which I assuredly do not. If they were in charge, I would miss the stimulus of living in a society where I have, at least theoretically, some part in the direction of public affairs. * * * " [51]

48. By Ralph T. Catterall of the State Corporation Commission of Virginia, Vol. 42, No. 9, September, 1956, pp. 829, et seq., 832–833.

49. The quotation is from the dissent of Chief Justice Vinson (who had written the opinion of the Court in Shelly v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161) in Barrows v. Jackson, 1953, 346 U.S. 249, 269, 73 S.Ct. 1031, 97 L. Ed. 1586.

50. Cf. "The Bill of Rights," Library of Congress Catalog Card No. 58–8248. See particularly Chapter III, "The Guardians," and pages 54, 68–73.

51. And see also "The School Segregation Cases: Opposing The Opinion Of The Supreme Court," By Eugene Cook and William I. Potter, Volume 42 American Bar Association Journal, page 313; "The Segregation Cases: A Deliberate And Dangerous Exercise Of Power," by Sims

28

## IX.

1. The "governed" are not able to put out of their minds that the judicial revolution of which the segregation decisions were a part was wrought under the conditions following the "court packing plan" and that within three years, the father of that plan had appointed a majority of the Supreme Court; and that eight of the nine Justices who rendered the Brown decision were appointed by President Roosevelt (five) or his vice president and political ally, President Truman (three) who had as Senator voted against killing the measure. Cong. Record 75th Congress, p. 9567. They are conscious of the fact also that not since the death of Chief Justice White in 1921 has any judge appointed from the "conquered provinces", sat as a member of that Court who has had a sympathetic understanding of the South's problem.[51a]

2. It is the universal conviction of the people of the conquered provinces also that the judges who function in this circuit should render justice in individual cases against a background of, and as

interpreters of, the ethos of the people whose servants they are. This is the genius of the judicial system established by Congress and as traditionally administered by those who select the judges— a process, incidentally, which all know follows normal political lines. The statutes creating the United States Courts of Appeal require that only citizens who are residents of the respective circuits at the time shall be eligible for appointment, and that they shall continue to reside in the circuit during their term of office (28 U.S.C.A. § 44(c) ). For decades, in this circuit, judges have been selected so that each state in the circuit shall be fairly represented on the court.

It is the firm conviction of the "governed" also that decisions such as this one, in cases brought by or on behalf of Negroes and involving the equal protection clause of the Fourteenth Amendment, have not been in harmony with the spirit, thought and desires of the people, the vast majority of whom, in both races, know that their common problems can best be worked out if they are left alone

Crownover, ib. 727; "Judicial Self-Restraint: The Obligation Of The Judiciary," by Ralph T. Catterall, ib. 829; "A Warning: Was It Justified?" by S. Bruce Jones, Vol. 43 ib., page 55; "Enforcement Of Federal Court Decrees: A 'Recurrence To Fundamental Principles' ", by Alfred J. Schweppe, Vol. 44 Ib. 113; "Construing The Constitution: A Trial Lawyer's Plea for Stare Decisis," by Wendell J. Brown, Ib. page 42; "The School Segregation Cases: A Legal Error That Should Be Corrected," by Charles J. Bloch, Vol. 45 Ib., page 27; "The Doctrine of Stare Decisis: Misapplied To Constitutional Law," by Hamilton Long, Vol. 45 Ib., page 921; "Georgia Constitution And Mixed Public Schools," by E. Cook, Ga.Bar J., 17:174–183; "Legal Standings Of The South's School Resistance Proposals," by F. B. Nicholson, S. C.L.Q., 7:1; "Segregation In Public Schools of Georgia," by R. H. Hall, Ga. Bar J., 16:417; "School Systems, Segregation And The Supreme Court," by H. E. Talmadge, Mercer L.Rev., 6:189; "Implications Of The Segregation Decision," by Jared Y. Sanders, Jr., La.Bar J., 4:93; "Schools, The Supreme Court And The States' Power To Direct The Re-

moval Of Gunpowder," by J. F. Johnston, Ala.Law., 17:3; "Segregation In Public Education—A Study In Constitutional Law," by C. O. Amonette, Ala. Law., 17:305; "White South Is A Minority Group: Supreme Court Cannot Bestow White Man's Inheritance On Another Race," by C. K. Brown, Ala.Law., 17:438; "Why Southerners Think As They Do," by M. Rushton, Ala.Law., 17:-339; "Separate But Equal—Dead or Alive?" Ga.Bar J. 19:541; "Desegregation Cases; Criticism Of The Social Scientist's Role," by K. B. Clark, Vill.L.Rev., 5:224; "Civil Rights—Or Civil Wrongs?" by C. J. Bloch, Ga.Bar J., 22:127; "The Law Of The Land," by C. J. Bloch (address before the Jacksonville Bar Association) ; "School Segregation Cases," by E. F. Leverett, Ga.Bar J., 23:9. And cf. the resolution of the Conference of Chief Justices meeting in Pasadena, Cal., Aug. 23, 1958.

51a. Mr. Justice Byrnes was a member of the Supreme Court for a year beginning in June 1941 but apparently no case of the character of the one before us was considered by the Court during his tenure.

to continue the unbroken improvement in relationships which has taken place in the last eight decades. They are keenly conscious of the fact that since the end of the tragic era following the War Between the States and in spite of the handicaps born of it, there has been a continuing growth in mutual understanding, respect and brotherhood between the members of the two races; and that the progress made by the Negroes in advancement educationally, socially, economically and in all other phases of their lives has exceeded that achieved by them anywhere else in any country at any time. That a breach in these relationships, achieved in the close and compassionate contacts which have taken place under such trying conditions should be permitted to occur is unthinkable to practically all of the people of good will of both races.

The rank and file of Negroes, realizing the hardship under which they labor by reason of the head-start of several centuries enjoyed by white people, and proud of their race and its accomplishments, resent the efforts of the agitators who do not understand, to confer a status upon them which is achieved and can be maintained only under force of the heavy hand of the law. They feel, in common with their white neighbors, that the judges should perform their duties with a sympathetic understanding of the true facts; and further that such an understanding has been tragically lacking in many of the decisions of many of the Judges in the Fifth Circuit whose actions have gone so far to the other extreme that Time Magazine gave six of the Judges an enthusiastic write-up with photographs in its issue of December 5, 1960, page 14. The article, encircled in red for emphasis, was headed "Trail-Blazers on the Bench —South's U. S. Judges Lead a Civil Rights Offensive." It stated that the Judges extolled constituted "an honor roll without precedent in United States legal annals" and that they had "collectively * * * launched one of the great, orderly offensives of legal history." Within a few days of this publication by the self-chosen cheerleader for the offensive group, court actions were taken in Louisiana and in Georgia which, the "governed" think, were as drastic and intemperate as any for which the Supreme Court has been so much criticised.[52]

### X.

The alacrity with which the United States Courts in both states struck down state statutes (in Georgia by the action of one judge alone, cf. 28 U.S.C. §§ 2281–2284) rejected the regulations and actions of school officials, ordered state officials hither and yon on a few moments' notice, doubtless furnished the mentioned publication further support of its characterization of judges and judicial action as "offensive." Such proceedings might escape being referred to as tragic if we could ignore the sobering words uttered by people of the stature of Reverend Billy Graham, world famous evangelist,

---

52. E. g., some of the language used by the United States District Court for the Eastern District of Louisiana in Bust et al. v. Orleans Parish School Board and companion cases, 188 F.Supp. 916, 925–926, does not, in my opinion, accord to the Legislature of Louisiana the presumption of good faith or the dignity normally expected from one member of our dual sovereignty in its dealings with the other: "But this invocation of 'constitutional processes' is a patent subterfuge * * * Even assuming their good faith in proposing * * *

"The conclusion is clear that interposition is not a constitutional doctrine. If taken seriously it is illegal defiance of Constitutional authority. Otherwise, *it amounted to no more than a protest, an escape valve through which legislators blew off steam to relieve their tensions*," [Emphasis supplied.]

The same court, moreover, as if to make sure that there would be a direct clash between representatives of the two sovereignties, called upon the United States Department of Justice to take up the cudgels for a private litigant—already well represented.

prophet, and seer.[53] In his article in U. S. News & World Report of April 25, 1960, pp. 94 et seq., entitled "No Solution to Race Problem 'At The Point of Bayonets' ":

"The Supreme Court can make all the decisions it feels are necessary; but, unless they are implemented by good will, love and understanding, great harm will be done.

" * * * At the same time I am convinced that some extreme Negro leaders are going too far and too fast. I am also alarmed by certain extreme elements in the press who fan the fires of racial prejudice. A Negro leader confessed to me, 'I have as much racial prejudice in my heart as any white man I've ever known.' A New York Negro leader told me three years ago, 'I hate all whites.' Racial prejudice is a two way street. It must be ended and Christian love must prevail.

"I am also concerned about some clergymen of both races that have made the 'race issue' their gospel. This is not the gospel! * * *

" * * * Only the supernatural love of God through changed men can solve this burning question * *

" * * * The issue in America has moral, social and political implications. Sometimes these questions are extremely complicated—and equally devout men see them somewhat differently. * * * "

Challenging words these! I am unable to follow the majority here, because I think it is applying force, blind and witless, in a situation where love alone can triumph. If Caesar can accomplish anything in this situation, it must be keyed to the magnificent progress which has been made by men of good will of both races out of the love in their hearts.

If this progress and its manifest benefits are to be lost or even crippled by the intemperate and ill-considered actions of those who speak in behalf of government, then great is the sin of those of us who are entrusted for a brief moment with that responsibility.

by purifying men's hearts that he will not address an audience which is segregated by compulsion.

---

53. It is common knowledge that Reverend Graham has such a firm conviction that social barriers should be broken down